**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellee,**

v.

**TEXAS GULF SULPHUR COMPANY, a Texas Corporation, et al., Defendants-Appellants.**

**No. 914, Docket 35143.**

United States Court of Appeals, Second Circuit.

Argued May 11, 1971.

Decided June 10, 1971.

Philip A. Loomis, Jr., Gen. Counsel, David Ferber, Solicitor, Frank E. Kennamer, Jr., Asst. Gen. Counsel, Robert E. Kushner, Asst. Gen. Counsel, Harvey L. Pitt, Stuart A. Morse, Attys., SEC, for appellee.

Orison S. Marden, White & Case, P. B. Konrad Knake, Thomas McGanney, W. Neil Thomas, III, New York City, for appellants Texas Gulf Sulphur, Fogarty, Mollison, Stephens and Kline.

David M. Crawford, pro se.

Earl L. Huntington, pro se.

Thomas A. Butler, Michael A. Grean, Keane, Butler & Grean, New York City, for appellants Holyk, Darke and Clayton.

Before FRIENDLY, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

The within appeals bring before us for the second time the well-known combinations of situations that arose out of Texas Gulf Sulphur's (hereinafter TGS) discovery of rich ore deposits near Timmins, Ontario, and the accompanying stock transactions by the appellants. A detailed description is set forth in our prior opinion, 401 F.2d 833 (2 Cir. 1968) (in banc).[1] In that decision we reversed the district court with reference to its findings, contained in its opinion, 258 F.Supp. 262 (SDNY 1966), as to several of the defendants who had been found below not to have violated Section 10(b) of the Securities Exchange Act of 1934 (hereinafter the Act), 15 U.S.C. § 78j (b), and Rule 10b–5, 17 CFR 240.10b–5, promulgated thereunder, and we remanded the case for a hearing on the appropriate remedies to be applied[2] and for the resolution of one undecided question of liability. That hearing has been held, and varying sanctions have been applied. The judgment order entered below (1) enjoined defendants Clayton and Crawford from future violations of Rule 10b–5, (2) denied injunctions against TGS, and defendants Fogarty, Mollison, Stephens, Darke, Huntington, Holyk, and Kline although each was found to have violated 10b–5, (3) required Darke to pay to TGS the profits which he and his tippees made on TGS stock prior to April 17, 1964, (4) required Holyk, Huntington, and Clayton to pay to TGS the profits which each of them made on the TGS stock prior to April 17, 1964,[3] and (5) required Kline's stock option to be canceled. In deciding the issues presented on this appeal, we have grouped the issues for easier discussion.

A. *TGS—The April 12 press release.*

On April 12, 1964, TGS issued its now famous press release dispelling rumors about the results of its exploratory drilling at Timmins. In our prior opinion we found that this release satisfied all the elements of a violation of Rule 10b–5, with the exception that a hearing was neeeded in order to determine whether the release was "misleading to the reasonable investor," 401 F.2d at 863, and whether this was caused by a lack of due diligence. On remand Judge Bonsal received both live and deposition testimony from a series of former TGS shareholders who claimed to have sold their stock because of the contents of the April 12 press release. Counsel for TGS objected to this testimony as non-expert opinion testimony of the ultimate fact for decision by the trier of fact, that is, whether the release was misleading. When these objections were overruled, TGS presented its own string of witnesses who testified that in their opinion the release was optimistic and not mis-

---

1. A petition to our in banc court for rehearing was subsequently denied, and two petitions for certiorari, one filed by a party not now in the case, and one by a present appellant, Kline, were denied by the Supreme Court, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

2. Pursuant to a stipulation by all parties entered into prior to the former appeal, the question of appropriate remedies was deferred for imposition by the district court pending a final determination in appellate courts or upon remand to the district court of whether the defendants or any of them had violated Section 10(b) and Rule 10b–5.

3. Another defendant, Thomas P. O'Neill, was also directed to make similar payments to the TGS escrow fund. This order was entered upon a default judgment, and no appeal has been taken by O'Neill.

leading. On the basis of this contradictory testimony Judge Bonsal found that the release was misleading to the reasonable investor and that it violated Rule 10b–5. Nevertheless, because there was no showing of any reasonable likelihood that TGS would violate Section 10 (b) and Rule 10b–5 in the future, Judge Bonsal denied the SEC's request for an injunction against the corporation.

■■ Upon appeal TGS first contends that the admission of non-expert opinion testimony as to whether the press release was misleading was error. We first note that, contrary to the TGS contention, this testimony did not go to the ultimate issue. The ultimate issue was whether the release was "misleading to the reasonable investor." The testimony of the SEC's witnesses was only that they individually had sold their stock on the basis of the April 12 press release. Cf. Goldwater v. Ginzburg, 414 F.2d 324, 343 (2 Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970). See also Rule 704, Proposed Rules of Evidence for United States Courts and Magistrates (March 1971). There is little doubt that the testimony offered by the SEC was relevant to whether the release was misleading to the "reasonable investor," but its relevance does not mean that the testimony itself was of the ultimate fact. Nor does the claim that the testimony was possibly opinion testimony render it inadmissible. All human perception includes elements of subjective conclusions, and the line between factual and opinion testimony is often undefinable. As stated by Judge Learned Hand in United States v. Cotter, 60 F.2d 689, 693–694 (2 Cir), cert. denied, 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932):

> No rule is subject to greater abuse [than the opinion testimony rule]; it is frequently an obstacle to any intelligible account of what happens. Most witnesses will tell their story in colloquial speech which skips the foundations and runs in terms of the "ultimate facts." Ordinarily, they tell it much more plainly in this way, and

the warrant for what they say can be perfectly probed by cross-examination.

See also United States v. Petrone, 185 F.2d 334, 336 (2 Cir. 1950), cert. denied, 340 U.S. 931, 71 S.Ct. 493, 95 L.Ed. 672 (1951). Of course, a foundation for opinion testimony must be laid, see Rule 701, Proposed Rules of Evidence for United States Courts and Magistrates (March 1971), and, without question, a foundation was laid here. In such cases, especially where there is no jury, the admission of this kind of testimony lies quite properly within the discretion of the trial court.

TGS also points to a number of facts which it claims makes the SEC's witnesses appear to be "unreasonable," instead of "reasonable," investors. However, these factors go only to the weight of the evidence and were thoroughly explored by TGS upon cross-examination. We conclude that Judge Bonsal's findings of fact on this issue, after his careful and painstaking weighing of the conflicting testimony in the light of our prior opinion, are not clearly erroneous findings, and we hold, with him, that the press release of April 12 was indeed misleading to the reasonable investor.

■ TGS next contends that it exercised due diligence in issuing the April 12 press release. However, the district court found, on the basis of the standard laid down in our former opinion, that "the framers of the press release failed to exercise due diligence." 312 F.Supp. at 86. TGS urges that this finding was not an independent finding of fact but a mere adoption of the views in our previous opinion. On this issue TGS introduced no additional evidence on remand, and, without such additional testimony, the fact that the district judge's finding concurred with what TGS claims to have been the view of the in banc court in no way impeaches the independence of the district judge. We find nothing improper in the challenged finding of lack of due diligence.

■■ TGS finally contends that the finding of a violation of Rule 10b–5 for

mere negligence in the issuance of the April 12 press release infringes its First Amendment rights.[4] However, the First Amendment deals with the free exchange of ideas and not with commercial "factual" speech. Valentine v. Chrestensen, 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed.2d 1262 (1942); Securities & Exch. Comm'n v. Wall Street Transcript Corp., 422 F.2d 1371, 1379–1381 (2 Cir.), cert. denied, 398 U.S. 958, 90 S.Ct. 2170, 26 L.Ed.2d 542 (1970); New York State Broadcasters Ass'n v. United States, 414 F.2d 990, 996–997 (2 Cir. 1969), cert. denied, 396 U.S. 1061, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); Banzhaf v. FCC, 132 U.S.App.D.C. 14, 405 F.2d 1082, 1101–1102 (D.C. Cir. 1968), cert. denied sub nom. Tobacco Institute v. FCC, 396 U.S. 842, 90 S.Ct. 50, 24 L.Ed.2d 93 (1969); cf. Curtis Publishing Co. v. Butts, 388 U.S. 130, 150 & n. 14, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Garrison v. State of Louisiana, 379 U.S. 64, 75, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). The April 12 release was a corporate report on the progress of TGS's drilling operations near Timmins, Ontario, and, insofar as the First Amendment's protection of speech is concerned, the report is in the same category as corporate registration statements and prospectuses.

■ The finding that TGS violated 10b–5 is well-founded and, in our view, unassailable, and though TGS argues that the complaint should be dismissed as to it inasmuch as the injunction the SEC sought was not granted, we affirm the denial of an injunction without dismissing the complaint as a proper discretionary decision by the trial judge under the circumstances. See Sullivan v. Committee on Admissions & Grievances, 130 U.S.App.D.C. 14, 395 F.2d 954 (1969).

*B.  Injunctions—Clayton and Crawford.*

Clayton and Crawford were the only defendants enjoined from committing future violations of Rule 10b–5.[5] They contend that this action was discriminatory, particularly because there was no evidence to indicate that their former violations might be repeated. Although we suspect that all the defendants will be circumspect in their future stock transactions, we find that, if any injunctions are to be issued, there is sufficient distinction in Clayton's and Crawford's cases for the district court to single them out. Both of these defendants, having inside information as to the results of the Timmins drilling, bought stock within 24 hours before the news of the ore strike was made public. Indeed, Clayton and Crawford were the only appellants who had been adjudged violators of Rule 10b–5 by the district court at the first trial of this case. Although the other defendants might have argued that they could not see the "development" of the law which resulted in their having been found by our court to have violated Rule 10b–5, Clayton's and Crawford's conduct was highly suspect even under the principles which the district court applied in its first decision. 258 F.Supp. 262, 285–287 (SDNY 1966).

Clayton again contends, as he contended before, that it was reasonable for him to believe that his stock purchases would be transacted after the public received the full news of the Timmins discovery. However, his present argument is precluded by our former decision which dealt fully with the issue which Crawford would have us now reconsider. 401 F.2d at 856.

■ In issuing the injunctions against Clayton and Crawford under these circumstances the district judge

---

4. Inasmuch as this issue was not decided by our prior opinion, it is not foreclosed by that decision. It was raised initially in the petition for rehearing, and being bottomed upon an alleged infringement of a constitutional limitation is fully considered here.

5. The injunctions were drawn to cover the circumstances of the violations and enjoined Clayton and Crawford from engaging in the future in any purchases or sales of TGS securities on the basis of undisclosed material information relating to TGS which is acquired by reason of any "insider" relationship with TGS.

did not abuse his discretion. See Securities & Exch. Comm'n v. Culpepper, 270 F.2d 241, 250 (2 Cir. 1959).

## C. *Restitution of Profits.*

The district court required Holyk, Huntington, Clayton, and Darke to pay to TGS the profits they had derived (and, in Darke's case, also the profits which his tippees had derived) from their TGS stock between their respective purchase dates and April 17, 1964, when the ore strike was fully known to the public. The payments are to be held in escrow in an interest-bearing account for a period of five years, subject to disposition in such manner as the court might direct upon application by the SEC or other interested person, or on the court's own motion. At the end of the five years any money remaining undisposed of would become the property of TGS. To protect the appellants against double liability, any private judgments against these appellants arising out of the events of this case are to be paid from this fund.[6]

Appellants contend that, although the district court is given general equity powers under § 27 of the Act, the SEC does not have authority under the Act to seek anything but injunctive relief under § 21(e), together with whatever ancillary relief is necessary to enforce an injunction, such as the appointment of a receiver. They further contend that the payments required in this case are in essence penalties for they contain no element of compensation to those who may actually have been damaged, and that if it were appropriate to consider the assessment of penalties, it was nec-

essary for the Attorney General to bring a criminal action under § 32.

However, despite some legislative history purportedly to the contrary,[7] we do not read § 21(e)[8] as restricting the remedies which the SEC can pursue to injunctive relief. The appellants concede that the courts of appeals have upheld the equity power of the district courts to authorize as ancillary relief the appointment of receivers under the Securities Exchange Act of 1934 at the request of the SEC even though no specific statutory authority exists for such action. Securities & Exch. Comm'n v. Bowler, 427 F.2d 190, 197–198 (4 Cir. 1970); Securities & Exch. Comm'n v. Bartlett, 422 F.2d 475, 477–478 & n. 6 (8 Cir. 1970); Lankenau v. Coggeshall & Hicks, 350 F.2d 61 (2 Cir. 1965); Esbitt v. Dutch-American Mercantile Corp., 335 F.2d 141, 143 (2 Cir. 1964); Los Angeles Trust Deed & Mortgage Exchange v. Securities & Exch. Comm'n, 285 F.2d 162, 181–182 (9 Cir. 1960).

Moreover, in other contexts the Supreme Court has upheld the power of the Government without specific statutory authority to seek restitution, and has upheld the lower courts in granting restitution, as an ancillary remedy in the exercise of the courts' general equity powers to afford complete relief. Mitchell v. Robert DeMario Jewelry, 361 U.S. 288, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960); United States v. Moore, 340 U.S. 616, 71 S.Ct. 524, 95 L.Ed. 582 (1951); Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed.2d 1332 (1946). There is little doubt that § 27 of the Act confers general equity power upon the

---

6. According to the district court's opinion, 312 F.Supp. at 93, the settlement orders are to be fashioned after that established with the defendant Coates who is not now an appellant. The relevant terms of the Coates settlement are set forth in footnote 23 of the district court's opinion.

7. S.Rep. 792, 73d Cong., 2d Sess., 1934. p. 22; H.R.Rep. 1383, 73d Cong., 2d Sess., 1934, p. 27.

8. § 21(e) (15 U.S.C. § 78u(e)) reads: Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation * * * it may * * * bring an action * * * to enjoin such acts or practices, and upon a proper showing a permanent or temporary injunction or restraining order shall be granted without bond.

district courts. Appellants' contention is that the SEC is without the authority to request the exercise of these powers. However, as stated in Mills v. Electric Auto-Lite Co., 396 U.S. 375, 391, 90 S.Ct. 616, 625, 24 L.Ed.2d 593 (1970): "[W]e cannot fairly infer from the Securities Exchange Act of 1934 a purpose to circumscribe the courts' power to grant appropriate remedies." While *Mills* was dealing with relief to private litigants, we deem the above statement to be fully applicable in enforcement actions by the SEC. Thus we hold that the SEC may seek other than injunctive relief in order to effectuate the purposes of the Act, so long as such relief is remedial relief and is not a penalty assessment.

Appellants, of course, contend that the required restitution is indeed a penalty assessment. See Beck v. Securities & Exchange Comm'n, 430 F.2d 673 (6 Cir. 1970). This contention overlooks the realities of the situation. In our prior opinion we found that these appellants had violated the Act by their purchases of TGS stock before there had been a public disclosure of the ore discovery. Restitution of the profits on these transactions merely deprives the appellants of the gains of their wrongful conduct. Nor does restitution impose a hardship in this case. The lowest purchase price of any of the transactions here was $17.75 per share paid by Clayton on November 15, 1963. The mean average price of the stock on April 17, 1964, has been stipulated by the parties to be $40.375 per share. By May 15, 1964, the stock was selling at $58.25 per share. The court's order requires only restitution of the profits made by the violators prior to general knowledge of the ore strike on April 17, 1964, and, in effect, leaves the appellants all the profits accrued after that date. It would severely defeat the purposes of the Act if a violator of Rule 10b–5 were allowed to retain the profits from his violation. The district court's order corrects this by effectively moving the purchase dates of the violators' purchases up to April 17, 1964.

As to the requirement that Darke make restitution for the profits derived by his tippees, admittedly more of a hardship is imposed. However, without such a remedy, insiders could easily evade their duty to refrain from trading on the basis of inside information. Either the transactions so traded could be concluded by a relative or an acquaintance of the insider, or implied understandings could arise under which reciprocal tips between insiders in different corporations could be given.

Finally, appellants contend that the order is punitive because it contains no element of compensation to those who have been damaged. However, as the New York Court of Appeals in Diamond v. Oreamuno, 24 N.Y.2d 494, 499, 301 N.Y.S.2d 78, 81–82, 248 N.E.2d 910, 912–913 (1969), recognized, a corporate enterprise may well suffer harm "when officers and directors abuse their position to obtain personal profits" since "the effect may be to cast a cloud on the corporation's name, injure stockholder relations and undermine public regard for the corporation's securities." Although the sellers of TGS stock who sold before April 17, 1964, may have a higher equity than TGS to recover from appellants the wrongful profits appellants obtained, this fact does not preclude conditional compensation to TGS. Nor, as the appellants appear to imply, is the district court precluded from applying a state concept of harm to the corporation.

We conclude that the requirement of restitution in this case was a proper exercise by the trial judge of the district court's equity powers.

D. *Kline—cancellation of stock option.*

In our prior opinion we directed the district court to cancel Kline's stock option to rectify his violation of Rule 10b–5 (the other four stock options had been voluntarily canceled or were otherwise not in issue). 401 F.2d at 857. Although, as with the requirement

of restitution considered above, the district court had the power to order the cancellation of the option so as to effect the purposes of the Act, we confess our error in instructing the district court without further proceedings there to apply this remedy inasmuch as the question of remedies was not before this court on the prior appeal. By stipulation of the parties, the question of appropriate remedies was deferred pending a final determination on whether Rule 10b–5 had been violated. See 401 F.2d at 839 n. 1. Hence, none of the parties argued or briefed the question of remedies on the last appeal. On remand, the district court, confronted with our unambiguous instruction, ordered the cancellation of Kline's stock option without holding a hearing on the issue. Thus, Kline has been deprived of his day in court on the question of an appropriate remedy, and we must remand Kline's case for a hearing on this question.

Kline also urges that his admittedly limited knowledge of the drilling results at the time he accepted the option was not material even under the definition of "materiality" we laid down in our prior decision. While we agree that Kline's lack of dealing in TGS stock would seem to support his claim of limited knowledge, thus making the question an extremely close one factually, this issue was fully before the in banc court and no sufficient reason is advanced why this court's prior determination should be changed. However, Kline is not precluded from arguing the borderline nature of his violation upon remand insofar as it may bear on the question of the appropriate remedy to be applied to him.

E.  *Crawford—The right to oral argument before an in banc court.*

Crawford urges that he was denied both his statutory rights and his constitutional right to procedural due process on the last appeal because oral arguments were not allowed before at least a quorum

of the in banc court. In support of this contention Crawford relies heavily on 28 U.S.C. § 46(c) [9] and the partial interpretation of that section given in United States v. American-Foreign S.S. Corp., 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960), where it was held that the words "determined" and "active" were to be used in their literal sense in deciding the eligibility of court of appeals judges to sit on an in banc court. Crawford urges that the word "heard" should likewise be given a literal interpretation and, therefore, he claims that oral arguments are required before at least a quorum of the in banc court.

We point out that the Supreme Court cautioned at the very beginning of its opinion in *American-Foreign S.S. Corp.* that "[t]he question to be decided * * is a narrow one." In concluding that only judges in "active service" were eligible to sit on in banc panels, it specifically referred to its earlier decision in Western Pacific R. Corp. v. Western Pacific R. Co., 345 U.S. 247, 73 S.Ct. 656, 97 L.Ed. 986 (1953), as authoritative on the legislative history and intent of § 46(c). Thus, because the present question of hearing procedure is different from the narrow question of judicial eligibility in *American-Foreign S.S. Corp.*, we turn to *Western Pacific.*

As explained in *Western Pacific*, § 46 (c) was merely a ratification of the earlier decision in Textile Mills Securities Corp. v. Commissioner, 314 U.S. 326, 62 S.Ct. 272, 86 L.Ed. 249 (1943), in which the Supreme Court held that the courts of appeals had the power to hear cases in banc. As stated in *Western Pacific*:

> § 46(c) is not addressed to litigants. It is addressed to the Court of Appeals. It is a grant of power. It vests in the court the power to order hearings en banc. It goes no further. 345 U.S. at 250, 73 S.Ct. at 659.

---

9. § 46(c) reads:
Cases and controversies shall be heard and determined by a court or division of not more than three judges, unless a hearing or rehearing before the court *in banc* is ordered by a majority of the circuit judges of the circuit who are in regular active service.

Thus, § 46(c) does not confer rights upon the litigants:

> The statute deals, not with rights, but with power. * * * Because § 46 (c) is a grant of power, and nothing more, each Court of Appeals is vested with a wide latitude of discretion to decide for itself just how that power shall be exercised. 345 U.S. at 259, 73 S.Ct. at 662.

*American-Foreign S.S. Corp.*, upon which Crawford relies, concerned solely a question of "power," the eligibility of a circuit judge not in active service to sit on an in banc panel. In marked contrast to this, when the Supreme Court was faced with a procedural interpretation of § 46 (c) in Shenker v. Baltimore & Ohio R.R. Co., 374 U.S. 1, 83 S.Ct. 1667, 10 L.Ed.2d 709 (1963), it gave broad leeway to the Court of Appeals to render its own interpretation of the word "majority" in § 46(c). It specifically referred to the problem as one of "internal administration." 374 U.S. at 5, 83 S.Ct. 1667.

■ Because § 46(c) pertains only to our power to convene in banc panels, we do not interpret it as requiring that a convened in banc court must listen to oral arguments. The decision to grant or not grant oral arguments on cases in banc is purely a matter of discretion, and the court may limit the issues to be presented to it and the method of advancing the arguments to it.

■ Crawford also contends that the lack of oral arguments before the in banc court deprived him of due process under the Fifth Amendment. As to this contention, it seems obvious that the power to deny a rehearing clearly encompasses the power to limit a rehearing so long as the parties are treated equally. We find no merit to this claim.[10]

### F. *Fogarty, Mollison and Stephens.*

■ The trial court on remand found that under the circumstances no relief needed to be ordered against these three defendants. Because no relief was granted, these defendants urge that the complaint should have been dismissed as to them and the recitation of their violations of the Act stricken from the judgment. We disagree. Because of the nature of the violations, it was within the district court's discretion to deny injunctive relief without dismissing the complaint. See Sullivan v. Committee on Admissions and Grievances, 130 U.S.App. D.C. 14, 395 F.2d 954 (1969).

### G. *Conclusion.*

In summary, therefore, we affirm the judgment below as to each of the appellants, with the exception that the order cancelling Kline's stock option is reversed and his case is remanded for a hearing on the appropriateness of that remedy.

---

10. We also note that the Fifth Circuit has exercised a discretion to dispose of oral arguments at the original "hearing" before three-judge panels. Rule 18, 5 Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York, 431 F.2d 409, 410–414 (5 Cir. 1970). Inasmuch as the validity of this practice is not now before us, we do not intend that anything stated in the present opinion be construed as approving or disapproving the denial of oral arguments at the initial "hearing" on appeal, despite the existence of authority in support of such a practice. See FCC v. WJR, 337 U.S. 265, 276, 69 S.Ct. 1097, 93 L.Ed. 1353 (1949); Davis, Administrative Law § 7.07 at 434.