SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

James H. RANDOLPH, Jr., and Charles Blackard, Defendants.

No. C–82–5343 WHO.

United States District Court, N.D. California.

April 15, 1983.

John H. Sturc, U.S. S.E.C., Div. of Enforcement, Washington, D.C., Bobby C. Lawyer, Associate Regional Admin., U.S. S.E.C., San Francisco, Cal., for plaintiff.

Robert F. Watson, Law, Snakard & Gambill, Fort Worth, Tex., David J. Romanski, Steinhart & Falconer, San Francisco, Cal., for defendants.

## OPINION

ORRICK, District Judge.

"Insider trading" is the term commonly used to describe the act of purchasing or selling securities while in the possession of material nonpublic information about an issue or the trading market for an issuer's securities. Chief Justice Burger has described this misappropriation of valuable, nonpublic information entrusted to a person in confidence as simply "stealing." *See Chiarella v. United States,* 445 U.S. 222, 245, 100 S.Ct. 1108, 1123, 63 L.Ed.2d 348 (1980) (Burger, C.J., dissenting).

Regardless of what economic benefit it may confer on some people or how it may be justified for the economy as a whole, the fact remains that it is against the law. It is proscribed by Section 10 of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated by the Securities and Exchange Commission ("SEC") pursuant to the 1934 Act.

This insider trading case came before the Court when an SEC lawyer filed documents entitled Complaint for a Permanent Injunction and Other Equitable Relief, Consent and Undertaking of James H. Randolph, Jr., duly signed by James H. Randolph, Jr., Consent and Undertaking of Charles Blackard, duly signed by Charles Blackard, and lodged with the Court a Final Judgment of Permanent Injunction and Other Equitable Relief as to James H. Randolph, Jr., and Final Judgment of Permanent Injunction and Other Equitable Relief as to Charles Blackard.

The SEC lawyer then requested the Court to sign *ex parte* the Final Judgments and, upon its refusal to do so, noticed a motion for Entry of Proposed Final Judgments of Permanent Injunction and Consent and Undertaking of the defendants. For the reasons following, the Court denies the motions and declines to sign the two documents denominated "Proposed Final Judgment of Permanent Injunction and Other Equitable Relief, and dismisses the action."

I

A

This case is one of four brought to date by the SEC following the merger between Santa Fe International Corporation ("Santa Fe") and the Kuwait Petroleum Company ("Kuwait Petroleum"), announced October

5, 1981.[1] Shortly after the announcement, the SEC began an investigation of allegations of insider trading in Santa Fe securities and options. Defendant James R. Randolph is a vice-president of Santa Fe Minerals, Inc., a wholly-owned subsidiary of Santa Fe. Defendant Charles Blackard is a vice-president of Santa Fe-Windsor, a wholly-owned subsidiary of Santa Fe Minerals. George Willard Minor, who is not charged in the complaint, is Randolph's father-in-law. The complaint alleges that, by virtue of their employment status, Randolph and Blackard learned that Kuwait Petroleum was planning to make a tender offer to Santa Fe shareholders at very advantageous terms. Kuwait Petroleum agreed to offer upwards of $50 a share for Santa Fe common stock at a time when shares were selling for approximately $28 a share. Around mid-September, 1981, Randolph told Minor that Santa Fe was an excellent target for a takeover attempt in the near future. Minor accordingly purchased 30 October 30 call options at a total cost of $816.30. Blackard in turn purchased a total of 20 January 30 options at a total cost of $1,940. Minor subsequently purchased 35 more October 30 options at a cost of $243.23. Following the announcement of the merger agreement, the price of Santa Fe stock and options rose dramatically. Minor sold all of his 65 October 30 options on October 8, 1981, realizing total profits of $76,647.74. On January 4, 1982, Blackard exercised his 20 January 30 options into 2,000 shares of Santa Fe common stock, which he then tendered to Santa Fe for $51 a share; his total profit was $40,060.

### B

On these facts, the SEC followed its customary practice of entering into consent judgments with defendants wherein defendants, without conceding liability, agreed, on penalty of being held in contempt of court, to disgorge the profits of their transactions in Santa Fe options and not to disobey the law in the future. The Court declines to sign the Final Judgments because, first, the Court questions the adequacy of the so-called penalty sought by the SEC, which seems to the Court to be no more than telling a person caught stealing cookies that he must return them to the cookie jar, and agrees never to do it again; and, second, because the Court questions the necessity for, and propriety of, court intervention in this process in this case.

### II

### A

The Court recognizes that the SEC shares its view that current penalties for insider trading are inadequate but nonetheless declines to endorse a consent judgment that does not appear to be in the public's best interest.

Preliminarily, it should be noted that case law offers little guidance as to a district court's role in approving SEC consent judgments. The only relevant case brought to the Court's attention is an unpublished opinion by Chief Judge Young in *SEC v. Hermil,* No. 71–141–Orl–Civ–Y (M.D.Fla. Feb. 14, 1978).[2] Acknowledging the absence of case law with respect to a court's role in considering an SEC consent decree, Judge Young drew on analogous areas, specifically antitrust and Title VII class settlements. He concluded that he "must" approve the consent decree if it was not "unlawful, unreasonable or inequitable" (slip

---

1. The SEC has informed the Court of three other lawsuits: *SEC v. Certain Unknown Purchasers, et al.,* No. 81 Civ. 6553 (S.D.N.Y.); *SEC v. Martin, et al.,* No. C–82–381 (W.D. Wash.); and *SEC v. Feole, et al.,* No. 82–5018 LEW (Bx) (C.D.Cal.). Memorandum of Plaintiff Securities and Exchange Commission in Support of Entry of Proposed Final Judgments of Permanent Injunction at 2, lines 17–26.

2. The SEC also cited *SEC v. Blinder Robinson & Co.,* 511 F.Supp. 799 (D.Colo.1981), for the general proposition that if a consent decree promotes compliance with the securities laws, it should be approved. However, this case is not on point because it involved a fairness hearing held pursuant to a specific provision of the 1933 Act, following a settlement whereby defendants offered to shareholders shares of common stock in exchange for the shareholders' giving up legal claims against defendants.

op. at 13), and if it satisfied the objectives of the Securities Act (slip. op. at 18).

However, Judge Young's concern in *Hermil* was quite different from this Court's concern here. The *Hermil* case involved a 1933 Act action against promoters of a real estate scheme who had defrauded investors, and the court was concerned lest the settlement reached by the SEC and the defendants be considered unfair to the defrauded investors who were (basically) not getting back all the money they lost. Here, the Court is questioning the fairness of the consent judgment *not* with regard to individual sellers who lost potential profits because of defendants' insider trading; rather, the Court is concerned with the overall fairness of the settlement to the *public,* which is as much a beneficiary of the securities laws as are individual investors. *See United States v. Naftalin,* 441 U.S. 768, 775, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979); *United States v. Newman,* 664 F.2d 12, 18–19 (2d Cir.1981) (purpose of 1933 Act not only investor protection but also achievement of high standard of business ethics).

■ Moreover, the antitrust analogy does *not* suggest that courts should approve settlements that strike them as fair, with no further review. The Antitrust Procedures and Penalties Act requires that the Department of Justice file for industry and public consideration and comment a copy of the proposed decree and a public impact statement that explains the proposal and predicts the effects of the decree. The court is then required to hold a hearing on the decree and make findings as to the expected effects of the decree and whether it is in the public interest. 15 U.S.C. § 16 (1982 Supp.). The antitrust analogy suggests that courts should not be *required* to approve a consent judgment merely because the agency assures the court it is "not inequitable." It is true that in this case defrauded sellers will recover their money via the settlement. But the Court must also consider the public interest, which is not specifically represented in this *ex parte* proceeding.

B

■ The Court is thus obliged to look closely at the proposed consent judgment to see if it provides a remedy that fully effectuates Congress' purpose in enacting the securities laws. It is clear that a major purpose was to insure the integrity of the market, to which end public confidence therein had to be established:

"The purpose of this bill is to protect the investing public and honest business. . . . The aim is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion; to restore the confidence of the prospective investor in his ability to select sound securities; to bring into productive channels of industry and development capital which has grown timid to the point of hoarding; and to aid in providing employment and restoring buying and consuming power."

S.Rep. No. 47, 73d Cong., 1st Sess. 1 (1933), quoted in *United States v. Naftalin,* 441 U.S. 768, 775–76, 99 S.Ct. 2077, 2082–2083, 60 L.Ed.2d 624 (1979). Insider trading was a particular problem addressed by the Exchange Act. The 1934 report of the Senate Banking and Currency Committee stated:

"Among the most vicious practices unearthed at the hearings before the subcommittee was the flagrant betrayal of their fiduciary duties by directors and officers of corporations who used their positions of trust and the confidential information which came to them in such positions, to aid them in their market activities."

S.Rep. No. 1455, 73d Cong., 2d Sess. 55 (1934), quoted in 2 L. Loss, Securities Regulation 1037 (1961).

Despite Congress' outrage, the number of insider trading actions brought by the SEC has been small. From 1966 to 1980, there were only 37 reported actions based on 35

separate incidents of insider trading. Dooley, *Enforcement of Insider Trading Restrictions,* 66 Va.L.Rev. 1, 8–9 (1980). Moreover, according to Professor Dooley: "The penalties imposed as a result of Commission enforcement actions have been quite mild. This is partially explained by the Commission's almost preternatural tendency to settle." *Id.* at 12–13. The Court is thus doubly obligated to examine this settlement closely.[3]

█ In this proposed judgment, defendants are enjoined from further violations of Section 10(b), are required to disgorge the full amount of their profits to the injured parties, and agree to cooperate with the SEC in the prosecution of civil actions against other alleged violators. The question before the Court is not whether this settlement is fair to defendants or to injured parties—it obviously is—but whether it is fair to the public, *i.e.,* whether it goes far enough in making effective the purpose of the Act.

█ There is reason to believe that it does not. The purpose of remedies sought in SEC actions is to deter wrongdoers, not to compensate fraud victims. *List v. Fashion Park, Inc.,* 340 F.2d 457, 463 (2d Cir.), *cert. denied,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). Private civil actions can

compensate injured private parties. This is true even where disgorgement is sought. *SEC v. Hermil, supra,* slip op. at 8–10, quoting from the SEC's 1975 Annual Report to Congress. *See also* Ellsworth, *Disgorgement in Securities Fraud Actions Brought by the SEC,* 1977 Duke L.J. 641, 649–51. Mere disgorgement, however, is not much of a deterrent. An insider can trade on nonpublic information secure in the knowledge that if he is caught he need only restore his illicitly acquired proceeds.[4]

### C

The Court's concern with the inadequacy of the disgorgement remedy prompted it to inquire about other potential remedies that the SEC might be able to seek. In particular, the Court asked whether the SEC could require the defendants to pay interest on the amount of disgorged profits and/or to reimburse the government for the costs of investigation and litigation of their case. The Court also asked about prospects for criminal prosecution. The SEC then sought to explain its method of proceeding in a Supplemental Memorandum filed with the Court.

It was and still is the Court's belief that disgorgement of all profits derived from

---

**3.** In recent years, however, the SEC has stepped up its efforts to combat insider trading. Last year, it proposed to Congress Amendments to the Securities Exchange Act of 1934 (the Insider Trading Sanctions Act of 1982), H.R. 7352, 97th Cong., 2d Sess., 128 Cong.Rec. H8842 (daily ed. Dec. 2, 1982). The bill was reintroduced this year, H.R. 559, 98th Cong., 1st Sess., 129 Cong.Rec. H93 (daily ed. Jan. 6, 1983). In its Memorandum in Support of the Insider Trading Sanctions Act of 1982, the SEC noted that prior to 1978 it initiated about 40 cases involving insider trading, while since then over 50 insider trading cases have been brought, 20 of them since July 1981. *See* 128 Cong.Rec. E4996 (daily ed. Dec. 8, 1982).

**4.** The SEC agrees with these observations. The purpose of its proposed Amendments is to enhance penalties for insider trading. The Insider Trading Sanctions Act of 1982 proposed a civil penalty of up to three times the profit gained or loss avoided from insider trading. In its Memorandum in Support of the Act, the SEC noted:

"Disgorgement of illegal profits, the Commission's other major weapon against insider trading, is a useful equitable remedy because it strips the defendant of the fruits of his unlawful trading and returns him to the position he was in before he broke the law. But merely requiring a defendant to return 'stolen goods' does not penalize the defendant for his illegal conduct. Thus, the prospect of compelled disgorgement alone cannot dissuade anyone from violating the law. According to a seminal report prepared in 1972 for the Administrative Conference of the United States, the problem with disgorgement is
'that an insider who is caught improperly profiting from the use of material information is placed in no worse a position than the honest man who refuses to act.'
In short, disgorgement is 'hardly a disincentive for those who may cynically (and realistically) hope to avoid being caught.' "
128 Cong.Rec. E4997 (daily ed. Dec. 8, 1982) (citations omitted).

insider trading should at the very least require defendants to pay interest on the sum earned. The SEC's Supplemental Memorandum in fact indicates that in the three other cases resulting from the Kuwait Petroleum-Santa Fe merger the SEC *is* seeking disgorgement of profits plus interest. Moreover, the consent decree entered into by Darius Keaton in the case of *SEC v. Certain Unknown Purchasers,* No. 81 Civ. 6553, slip op. at 4 (S.D.N.Y. Sept. 29, 1982), requires Keaton to disgorge profits and interest on profits at a rate not to exceed ten percent. According to the SEC, interest in this case would amount to approximately $8,000. The SEC has informed the Court that it believes its settlement is in the public interest even though it does not call for the payment of interest because "the Commission is obtaining virtually all of the relief to which it is entitled and the maximum measure of profits as disgorgement without the risk and expense of litigation." Supplemental Memorandum at 5, lines 10–12. The SEC has not explained why it sought and obtained interest from Darius Keaton but not from these defendants. Given the strong case put together by the SEC, the risk and expense of litigation in this case seems relatively low, and the Court still does not understand why the SEC has not sought interest.

■ The SEC's explanation of its failure to recover costs of investigation is somewhat less puzzling. The SEC points out that it lacks statutory authorization to ob-

tain such recovery,[5] and that an order requiring defendants to reimburse the government for costs could be construed as a penalty and thus beyond the equitable purpose of a civil injunctive action. Disgorgement has been accepted as an equitable remedy, *see SEC v. Texas Gulf Sulphur,* 446 F.2d 1301, 1307–08 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), but it has been emphasized that the purpose of disgorgement is remedial (deterrence of future violations of securities laws) and that it cannot be used as a penalty. *See, e.g., SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978) ("The court's power to order disgorgement extends only to the amount with interest by which the defendant profited from his wrongdoing.")[6] It could be argued that requiring defendants to compensate the public for the cost of investigating and prosecuting market fraud—in short, for assuring market integrity—would not be penal. However, given the lack of specific statutory authorization for recovery of costs, as well as the fact that the disgorgement remedy itself was created by the SEC and the courts rather than being provided for expressly in the Securities Exchange Act,[7] the Court cannot say that the SEC was unreasonable in not seeking recovery of costs in this case.

The Court remains convinced that a major deterrent to insider trading is criminal prosecution. The Court, of course, recognizes that the SEC cannot bring criminal actions itself. But under 15 U.S.C. § 78u(d)

---

**5.** The SEC notes that in cases where the United States is permitted to recover its costs and seek civil fines or penalties, these recoveries are obtained pursuant to a specific statutory grant of authority, *e.g.,* 31 U.S.C. § 231 (liability of persons making false claims to the government); 41 U.S.C. § 604 (fraudulent government contract claims).

**6.** The SEC notes, however, that it does not rule out the possibility of seeking to recover costs in an egregious case. And the SEC has on occasion sought expansion of the disgorgement concept. *See* Ellsworth, *Disgorgement in Securities Fraud Actions Brought by the SEC,* 1977 Duke L.J. 641, 665. Thus, in *SEC v. R.J. Allen & Associates, Inc.,* 386 F.Supp. 866 (S.D.Fla. 1974), the court ordered disgorgement of all proceeds (not just profits) received by defend-

ants in their egregiously fraudulent transactions.

**7.** In *SEC v. Texas Gulf Sulphur Co.,* 312 F.Supp. 77 (S.D.N.Y.1970), *aff'd,* 446 F.2d 1301 (2d Cir.), *cert. denied,* 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971), the SEC sought, and the court approved, the remedy of disgorgement of profits in insider trading cases, even though it was not explicitly provided for by the Securities Exchange Act, because it is a court's duty to provide such remedies as are necessary to make effective Congress' purpose. *Id.* at 91. The court drew support from such well-known Supreme Court securities decisions as *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964), and *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970).

it may "transmit such evidence as may be available concerning such acts or practices as may constitute a violation * * * to the Attorney General." The Attorney General then has the usual prosecutorial discretion in deciding whether to institute criminal proceedings under 15 U.S.C. § 78ff. According to its own regulations, SEC policy is not to discuss criminal prosecution at all with defendants during the course of negotiating a civil consent judgment. 17 C.F.R. § 202.5 (1981). However, it is clear that the SEC may, and at least sometimes does, consider criminal prosecution and transmit evidence to the Attorney General while it is still negotiating with defendants for a civil consent judgment. This happened in *United States v. Fields,* 592 F.2d 638, 643–44 (2d Cir.1978), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979).

In its Supplemental Memorandum, the SEC assured the Court that it has not discussed criminal prosecution at all with either defendant in this case. No understandings or agreements have been reached.[8] The SEC has also assured the Court that it frequently makes referrals to the Department of Justice and that the

Department of Justice also requests information frequently from the SEC. According to the SEC's *47th Annual Report* at 150 (1981), the number of such referrals and access requests with respect to criminal prosecutions for violations of the federal securities laws generally increased from 38 in fiscal year 1972 to 86 in fiscal year 1981.[9] Supplemental Memorandum at 7, lines 11–14. Referrals from the San Francisco Branch have resulted in indictments and convictions in six separate criminal cases in the Northern District of California from May 1978 to October 1981. Supplemental Memorandum at 8, lines 2–4. The Court applauds the SEC's efforts in this area and hopes that referrals and access requests in the insider trading area will increase. Criminal prosecution remains a major, if not the most effective, deterrent in insider trading cases. The fact that powerful and wealthy corporate executives rarely pay fines or go to jail when they steal—while less privileged defendants do—not only undermines public confidence in our system of justice but more particularly undermines public confidence in the integrity of the securities market.[10]

---

**8.** The SEC declined to disclose to the Court whether it planned to refer any defendants in the Santa Fe merger cases to the Department of Justice for criminal prosecution, noting that:

"[I]t is the Commission's policy not to comment upon the existence or nature of its referrals to the Department of Justice or grants of access to Commission files by officers of the Department of Justice. The reasons for this policy are the same as those for the requirement of grand jury secrecy: to prevent the escape of those whose indictment may be contemplated; to insure the freedom of the grand jury in its deliberations; to encourage free and untrammeled disclosures by witnesses before the grand jury; and to protect the innocent accused who is exonerated by the grand jury."

Supplemental Memorandum at 8, lines 8–17. The Court cannot take issue with SEC policy in this respect, of course. But the Court continues to hope that at least the most flagrant offenders in the Santa Fe merger case, which involved millions of dollars' worth of insider trading profits, will be prosecuted. It should be noted, however, that as of November 18, 1982, the SEC had made no criminal referrals to the Department of Justice in any of the cases resulting from the Santa Fe-Kuwait Petroleum merger. Memorandum of John M. Fedders,

Director, Division of Enforcement, Securities and Exchange Commission, 128 Cong.Rec. E5116 (daily ed. Dec. 14, 1982).

**9.** It should be emphasized that these figures represent referrals/access requests in all cases of securities law violations. Referrals and access requests in *insider trading* cases make up only a small percentage of the total number. Since January 1, 1981, the SEC has made no referrals to the Department of Justice in any insider trading case. Since October 1979, the SEC made one referral and granted the Justice Department access to its files on thirteen occasions. Memorandum of John M. Fedders, Director, Division of Enforcement, Securities and Exchange Commission, 128 Cong.Rec. E5116 (daily ed. Dec. 14, 1982).

**10.** The late Representative Rosenthal, who introduced the Insider Trading Sanctions Act of 1982, H.R. 7352, shared the Court's concern that the SEC is not taking full advantage of the deterrent effect of criminal prosecution in insider trading cases. On October 1, 1982, in a letter to John Shad, Chairman of the SEC, Representative Rosenthal expressed surprise at the SEC's settlement with Santa Fe director Darius N. Keaton. Representative Rosenthal

### III

■ Accordingly, the Court concludes that while the SEC's authority to seek penalties in this case is indeed limited, it could nonetheless at least seek to recover interest. The SEC's failure to do so renders the consent judgment not in the public's best interest because it will have absolutely no deterrent effect on insider trading; on the contrary, this proposed judgment puts prospective insider traders on notice that if they are caught, the worst that will happen is that they will be required to give back the fruit of their crimes.

Moreover, there appears to be no reason for the Court to sign the final judgment. Although cast in the form of a lawsuit, the proceedings in this case resemble a negotiated arrangement between private parties. The Court's first involvement with the case came when the parties presented it with a completed agreement and, in effect, asked the Court to rubber stamp it. The case was essentially over by the time the parties appeared in court. Under the circumstances, the Court questions whether there is a sufficient controversy here to justify invocation of the Court's jurisdiction under Article III of the Constitution. Even if there was once a controversy, it appears to have disappeared before the SEC filed its complaint. This is not a "collusive" lawsuit in the usual sense, because the parties' interests were certainly opposed when they began negotiating. But by the time they came to court, they were in agreement. At no point during the court proceedings in this matter was there anything to litigate. The case was designed to be over before it had begun.

Even if there is jurisdiction, the Court questions why it is needed here. The SEC claims that the Court's signature is necessary to enforce the agreement it has made

with defendants. If defendants fail to disgorge profits, the SEC wants them held in contempt of court. But if there is a settlement agreement between the parties, it can be enforced on normal contract principles without the Court's prior intervention, just the way any agreement made between parties can be enforced—as, for instance, where a plaintiff who has suffered personal injury agrees to waive further claims against the defendant if she is paid a certain sum; if defendant fails to pay the sum, plaintiff goes to court and sues. So here, if the SEC, having waived its right to bring the defendants to trial, finds that they renege on their agreements to disgorge, it may then seek to enforce the agreements, at which point there *will* be a genuine controversy before the court.

### IV

There being no case or controversy within the meaning of Article III of the Constitution, this Court of limited jurisdiction holds that in this case it lacks jurisdiction and, accordingly, denies the motion of the SEC for Entry of proposed Final Judgments of Permanent Injunction and Other Equitable Relief, and Consent and Undertaking of the defendants, and dismisses the action.

commented, "Surely, the deterrent effect of the law is vitiated if a director or officer who had access to insider information is permitted to walk away from an insider charge without any penalty whatsoever except the repayment of an illegal profit. I find it ironic that the SEC is presently asking Congress to increase penalties against insider trading but apparently is not willing to use the ample prosecutorial options it

presently has." 128 Cong.Rec. E5118 (daily ed. Dec. 14, 1982). After Mr. Shad's response, Representative Rosenthal wrote to him again on October 13, 1982, suggesting that "[i]f the present law limits your civil penalties * * * the SEC should consider criminal referrals where appropriate in order to insure that the law has a deterrent effect." 128 Cong.Rec. E5117 (daily ed. Dec. 14, 1982).