SECURITIES AND EXCHANGE
COMMISSION, Plaintiff,

v.

Ann STEPHENSON, Frederick Stras-
burg, Richard Strasburg, and Sentra
Securities Corporation, Defendants.

No. 88 Civ. 3303(JES).

United States District Court,
S.D. New York.

Sept. 26, 1989.

Thomas C. Newkirk, David E. Dearing,
Stephen M. DeTore, John H. Walsh, Wash-
ington, D.C., for plaintiff.

Jones, Bell Simpson & Abbott, Los Ange-
les, Cal. (Craig R. Bockman, of counsel),
Brown & Wood, New York City (James K.
Manning, of counsel), for defendant Sentra
Securities Corp.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiff Securities and Exchange Com-
mission ("SEC") brings this action under
section 10(b) of the Exchange Act of 1934,
15 U.S.C. § 78j(b), Rule 10b–5, 17 C.F.R.
§ 240.10b–5, and 15 U.S.C. §§ 78a et seq.,
78d & 78aa to enjoin future violation of the
securities laws and to obtain disgorgement
of the profits obtained through those viola-
tions. The SEC has moved for summary
judgment against defendant Sentra Securi-
ties Corporation ("Sentra"), and Sentra has
cross-moved for judgment on the pleadings,
or in the alternative for summary judg-
ment. For the reasons set forth below, the
SEC's motion is granted and defendant's
motion is denied.

## FACTS

The following facts are undisputed.

On August 20, 1986, Ann Stephenson, a
Vice–President and Director of Public Af-
fairs of Beneficial Corporation ("Benefi-

cial"), learned from another corporate officer that Beneficial would make an announcement on August 21, 1986 that it was considering certain measures to maximize the value of Beneficial stock. *See* Affidavit of Ann Stephenson ("Stephenson Aff.") at ¶¶ 3–4. In addition, Stephenson was told that the information was highly confidential and would materially affect the price of Beneficial stock. *See id.* at ¶ 6.

That same afternoon Stephenson placed a telephone call to her brother, Frederick Strasburg ("Frederick"), in Palmdale, California. During that conversation she told Frederick to buy Beneficial stock because a material corporate development was in progress. *See id.* at ¶ 7; Affidavit of Frederick Strasburg ("F. Strasburg Aff.") at ¶ 4. A few hours later Frederick went to Sentra's offices and met with one of Sentra's brokers, Jason Albertson. Frederick opened two accounts with Sentra and instructed Albertson to purchase 4,925 shares of Beneficial, 4500 shares for Frederick's own account and 425 shares for the other account in the name of his father. *See* F. Strasburg Aff. at ¶ 5; Plaintiff's Exhibits ("Pl.Exs.") H, I. These trades were executed later that day on the New York Stock Exchange at $46⅛ per share. *See* Pl.Exs. H, I.

That same day, August 20, Frederick told his brother, Richard Strasburg ("Richard"), about his conversation with Stephenson and recommended that Richard buy Beneficial shares as well.[1] *See* F. Strasburg Aff. at ¶ 6; Affidavit of Richard Strasburg ("R. Strasburg Aff.") at ¶ 4. Richard then went to Sentra and opened an account instructing Albertson to purchase 2,000 shares of Beneficial. *See* R. Strasburg Aff. at ¶ 7. That order was executed on August 21, 1986 at $46⅝ per share. *See* Pl.Ex. J.

Beneficial made the expected announcement after the close of the stock market on August 21, 1986, and on August 22, Beneficial stock opened at approximately $74 per share.[2] *See* Consent of Ann Stephenson at ¶ 2, Pl.Ex. A. After the market opened on August 22, 1986, Frederick contacted Albertson and told him to sell 2500 shares of Beneficial. *See* Deposition of Jason Albertson ("Albertson Dep.") at 52. Later that day, he again contacted Albertson and told him to sell all but 500 of his remaining shares and to sell all of the shares in his father's account. *See id.* at 57–58; F. Strasburg Aff. at ¶ 7. That same day Richard contacted Albertson and directed him to sell all but 500 shares of the Beneficial stock in his account. *See* R. Strasburg Aff. at ¶ 8. Sentra executed all of these trades the same day.[3]

On August 26, 1986, William Walsh, an attorney representing the Strasburgs, called Albertson and informed him that Frederick and Richard wanted to "reverse" their trades. *See* Albertson Dep. at 70; F. Strasburg Aff. at ¶ 9; R. Strasburg Aff. at ¶ 8. This call was followed by written instructions confirming the request for a reversal.[4] *See* F. Strasburg Aff. at ¶ 9; R. Strasburg Aff. at ¶ 10. Thereafter, Sentra contacted its clearinghouse broker, Financial Investors Clearing and Services, Inc., and instructed it to transfer the Beneficial trades from the Strasburgs' accounts to Sentra's "error" account. *See* Pl.Ex. O. Although Sentra returned the Strasburgs' deposits, *see* Albertson Dep. at 89–90, none of the profits from the Beneficial trades were ever returned to the Strasburgs or to the sellers of the stock. *See* R. Strasburg Aff. at ¶ 13; F. Strasburg Aff. at ¶ 12;

---

**1.** After talking to Frederick, Richard called Stephenson to confirm the information he had received. *See* Stephenson Aff. at ¶ 8; Affidavit of Richard Strasburg ("R. Strasburg Aff.") at ¶ 5.

**2.** The announcement states that Beneficial was considering, "the sale of Beneficial, merger or other business combination with another entity, the sale of certain assets, repurchase of debt and equity securities and spin-off or sale of subsidiaries." *See* Stephenson Aff., Ex. A.

**3.** Albertson testified at his deposition that when Richard asked him to sell his stock he warned him about the possibility that he had traded on inside information in violation of the securities laws. *See* Albertson Dep. at 65–66.

**4.** Defendant Sentra has not submitted any probative evidence as to what the Strasburgs meant by the term reversal.

Stephenson Aff. at ¶ 10. Sentra sold the remaining 1,000 shares of Beneficial stock on August 28, 1986 at $71 per share, and retained the profits from that sale as well. *See* Pl.Ex. P. Sentra has asserted that it treated the Strasburgs trades as "fails", *i.e.,* as if the Strasburgs simply walked away from the deal, and thus, it shows the profits from the trades as gains on its books.

After this action was commenced Stephenson and the Strasburgs each entered into a consent judgment wherein they admitted the allegations of the complaint and agreed not to engage in further violations of the securities laws. *See* Pl.Exs. A–C. The SEC now seeks to force Sentra to disgorge the profits obtained through the Strasburg's trades in Beneficial stock.

## DISCUSSION

The remedy of disgorging funds obtained as a result of illegal insider trading is a judicially created adjunct to the SEC's power to enjoin violations of the securities laws under 15 U.S.C. § 78aa. *See SEC v. Certain Unknown Purchasers of Common Stock,* 817 F.2d 1018, 1020 (2d Cir.1987); *SEC v. Manor Nursing Centers,* 458 F.2d 1082, 1103–04 (2d Cir.1972); *SEC v. Texas Gulf Sulphur Co.,* 446 F.2d 1301, 1307 (2d Cir.1971). The primary purpose of this equitable relief is to prevent the violator from profiting from his wrong, thereby deterring future violations. *See SEC v. Tome,* 833 F.2d 1086, 1096 (2d Cir.1987).

 Sentra does not and cannot argue that Stephenson and the Strasburgs did not violate the securities laws. The Strasburgs have admitted their violations, and the facts support this admission.[5] Sentra does, however, argue that because the SEC has not even alleged that it violated the securities laws, there is no enjoinable violation to which the equitable remedy of disgorgement may attach. While this argument would have a certain force if Sentra had clear title to the funds at issue here, it must fail in the present situation where the violators, the Strasburgs, still hold title to the profits made from the sales of Beneficial stock.[6]

Here, it is undisputed that Sentra acted as the Strasburgs' agent for the purchase of shares of Beneficial stock, and that Sentra accepted a deposit of cash as partial payment for the stock. When Sentra purchased that stock, at the time of purchase, title to the stock passed to the Strasburgs. *See Tangorra v. Hagan Investing Corp.,* 38 A.D.2d 671, 327 N.Y.S.2d 131, 137 (4th Dep't 1971); *dupont, Glore Forgan, Inc. v. Mariash,* 75 Misc.2d 450, 452, 347 N.Y.S.2d 886, 888 (S.Ct.App.T. 1st Dep't 1973) (per curiam); Uniform Comm.Code, § 8–313(1)(d)(ii). Later, still acting as an agent for the Strasburgs, Sentra sold some of the stock and placed the proceeds in the Strasburgs' accounts. At that time, because the Strasburgs had engaged in insider trading, they held voidable title to the stock as a matter of federal law. *See SEC v. Levine,* 881 F.2d 1165, 1175–76 (2d Cir. 1989); 15 U.S.C. § 78cc(b).[7] Thereafter, the Strasburgs asked their agent to "reverse" the trades. Sentra did not, how-

5. Stephenson clearly violated Rule 10b–5 by breaching her fiduciary duty to Beneficial shareholders. *See Dirks v. SEC,* 463 U.S. 646, 653–54, 103 S.Ct. 3255, 3260–61, 77 L.Ed.2d 911 (1983). The Strasburgs derivatively breached that same duty by trading on information they had received as tippees with knowledge of its confidential nature. *See id.* at 660, 103 S.Ct. at 3264.

6. Thus, the Court need not address the issue of whether, as the SEC has argued, the Court has the power to order disgorgement of funds owned by a third party on the theory that a constructive trust for the benefit of the selling shareholders follows funds obtained by insider trading.

7. Pursuant to *SEC v. Levine,* a federal court must then look to state law to determine what property rights are conferred by a transaction which is voidable under federal law. *See* at 1176. Under both New York and California law a party to a contract, here the contract with the seller of the stock, who perpetrates a fraud, holds title, although a voidable title, to funds obtained as a result of the fraud. *See Stanton Motor Corp. v. Rosetti,* 11 A.D.2d 296, 298, 203 N.Y.S.2d 273, 276 (3d Dep't 1960); *Earl v. Saks & Co.,* 36 Cal.2d 602, 609–10, 226 P.2d 340, 345 (1951) (en banc). That title is voidable at the election of the defrauded seller. *See id.*

ever, reverse the trades, and did not tell the Strasburgs that it could not reverse the trades. Instead, it pocketed the profits.

 Sentra contends that it understood the term "reverse" to mean that the Strasburgs were revoking the agency relationship, and had thereby walked away from the deal. But Sentra has presented no evidence to show that the term should be given anything other than its common meaning, to put things back as they were,[8] *i.e.,* to sell the stock back to the original sellers at the original purchase price. The Court sees no reason to deviate from this construction even though, on the facts of this case, a reversal of the transaction in that sense could not actually be performed. Indeed, that circumstance imposed upon Sentra the duty to so inform the Strasburgs that the stock could not in fact be returned to the sellers and to await further instructions. *See Duffy v. King Cavalier,* 210 Cal.App.3d 1514, 259 Cal.Rptr. 162 (1st Dist.1989).

 Sentra contends that because Regulation T, 12 C.F.R. § 220.8(b)(4) requires it to cancel or liquidate a client account where the client has failed to pay for a stock within seven days of purchase, it is entitled to keep the proceeds where, as here, the client has failed to pay. That view of Regulation T is unsupportable. Regulation T requires such a sale to prevent violation of the margin requirements, and therefore enables a broker to liquidate an account to pay for the purchase price of the stock. It does not allow the broker to retain windfall profits resulting from the transaction. *See dupont, supra,* 75 Misc.2d at 452, 347 N.Y.S.2d at 888.

That conclusion is further supported by the circumstance that where a broker does not receive the full purchase price of the stock as a result of selling the stock, it may of course seek the difference between the sum realized and the purchase price from its customer. It follows that any profit resulting from such transactions must be held for the benefit of the customer. In

sum, Sentra has no colorable claim to the funds obtained as a consequence of the Strasburgs' insider trading and cannot therefore refuse to disgorge those sums to the SEC.

### CONCLUSION

The Court concludes that Sentra deviated from the instructions of its principal, and therefore it holds the profits of the trades for the benefit of the Strasburgs, *cf. Duffy, supra,* 210 Cal.App.3d at 1520, 259 Cal. Rptr. at 165, who still hold voidable title to the funds at issue. It follows that the disgorgement remedy may be properly invoked as an adjunct to the judgments enjoining the Strasburgs from violating the securities laws. Thus, summary judgment must be granted for the plaintiff. All parties shall appear for a conference on November 3, 1989 at 12:00 PM, to discuss the amount of money to be disgorged.

It is SO ORDERED.

---

8. The dictionary definition of reverse includes, *inter alia,* the following meanings: "to turn completely about in position or direction"; "to cause to go in an opposite direction". *See* Webster's Ninth New Collegiate Dictionary, at 1009 (1986).