**CONTINENTAL ASSURANCE COMPANY, Plaintiff,**

**v.**

**MACLEOD–STEDMAN, INC., a Canadian corporation, and The Toronto-Dominion Bank Trust Company, as Trustee, Defendants.**

**No. 87 C 9834.**

United States District Court, N.D. Illinois, E.D.

Aug. 3, 1988.

James E. Spiotto, Ann E. Acker, William P. Smith, John R. Weiss, Chapman & Cutler, Chicago, Ill., for plaintiff.

Willaim R. Carney, George J. Casson, Jr., Bell, Boyd & Lloyd, Chicago, Ill., for defendant Macleod-Stedman, Inc.

Kevin J. Walsh, Cory E. Friedman, Kelley Drye & Warren, New York City, Julian Solotorovsky, Kelley Drye & Warren, Chicago, Ill., for defendant The Toronto-Dominion Bank Trust Company, as Trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

HART, District Judge.

This cause comes to be heard on the Amended Complaint of Continental Assurance Company ("CNA"), seeking a declaratory judgment that the terms and conditions of the issuance and exchange of securities contemplated by the Proposed Settlement described below are fair and therefore should be approved; that such issuance and exchange of securities should be exempt from the registration provisions of the Securities Act of 1933 (the "1933 Act") by virtue of the exception set forth in § 3(a)(10) of the 1933 Act, 15 U.S.C. § 77c(a)(10); that notice of this court's hearing on the fairness of such terms and conditions was proper and adequate as to all registered holders of Mortgage Notes (as hereinafter defined), all persons who have represented themselves to CNA in writing to be beneficial holders of Mortgage Notes, and all persons known to Macleod-Stedman, Inc. ("MSI") to be beneficial holders of Mortgage Notes (collectively the "Noteholders"); and that MSI and the Toronto-Dominion Bank Trust Company, as Trustee ("TDB" or "Trustee") be directed to take all action necessary, appropriate, and desirable to consummate the Proposed Settlement. It is the opinion of this court after examining the relevant pleadings, hearing testimony and reviewing the evidence, hearing and considering the arguments of counsel, and reviewing and hearing any and all objections filed with the court, that it is just, proper and appropriate to enter an order approving the Proposed Settlement of the defaulted Mortgage Notes as set forth below, including the terms and conditions of the issuance and exchange of securities which is embodied in the Proposed Settlement. This court, after an evidentiary hearing, finds and concludes as follows:

## FINDINGS OF FACT

1. CNA is an Illinois insurance corporation with its principal place of business located in Chicago, Illinois and accordingly is a citizen and resident of the State of Illinois.

2. MSI is a citizen and resident of Canada, in that MSI is a corporation organized and existing under the laws of Canada with its principal places of business in Winnipeg, Manitoba and in Toronto, Ontario, Canada.

3. TDB is a corporation organized and existing under the laws of New York and has its principal place of business in New York, New York.

4. TDB is the duly appointed, acting and qualified Trustee under an Indenture dated as of October 15, 1984 as amended and supplemented (the "Indenture") between TDB, as Trustee, and MSI as Obligor, pursuant to which MSI issued its $30,000,000 (U.S.) Macleod-Stedman, Inc. 15½% Mortgage Notes due October 15, 1991 (the "Mortgage Notes"). The Notes were issued at a 15½% rate to increase to 17% on April 15, 1987 if MSI had not become a public company by that time and the higher rate was to continue until it became a public company. The rate so increased on April 15, 1987. A true and correct copy of the Indenture was attached to the Complaint and incorporated therein as Exhibit A, and was presented to this court and admitted into evidence as Plaintiff's Exhibit 1. (Hereinafter, all Plaintiff's Exhibits which were presented to this court and admitted into evidence will be referred to as "PX").

5. On or about October 15, 1984, $30,000,000 in principal amount of Mortgage Notes were issued by MSI pursuant to the Indenture. CNA was an original purchaser and is, as of the date hereof, a beneficial owner of $2,000,000 in principal amount of Mortgage Notes.

6. The names of the current holders of the Mortgage Notes and the face value of the Notes held by each Noteholder are part of the record in this proceeding. PX 22.

7. All the current Noteholders are institutional investors except for John Nagel. Nagel was formerly a vice-president at Dean Witter and is now employed as a bond trader. All the Noteholders are sophisticated investors.

8. CNA has acted as the lead for the Noteholder Group and is the only Noteholder that is a party to this case. CNA has no special interest that would cause it to be more interested in the Restructuring than other Noteholders. The Restructuring does not have special tax advantages for CNA and CNA's Mortgage Notes are already being carried on CNA's books as having impaired value for purposes of insurance company regulation.

9. The Indenture provides that the Mortgage Notes are secured indirectly by a mortgage lien on certain property of MSI or its subsidiaries, as is fully described in that certain Deed of Trust and Mortgage, dated October 15, 1984 by and between MSI, National Trust Company (formerly The National Victoria and Grey Trust Company) (the "Canadian Trustee"), and Macleod's Store Properties Limited, Gamble of Canada Properties Limited, and Sorenco Limited (collectively the "Subsidiaries"), as amended and supplemented (collectively, the "Deed of Trust"), a true and correct copy of which was attached to the Complaint and incorporated therein as Exhibit B, PX 2. Under the Deed of Trust, which constitutes a lien upon the properties of MSI and the Subsidiaries, a Bond was issued by MSI and pledged to the Trustee to secure the Mortgage Notes. Therefore, as holder of the Bond, the Trustee may direct the Canadian Trustee in the actions of the Canadian Trustee relating to the real and personal property of MSI and the Subsidiaries encumbered by the Deed of Trust.

10. The Mortgage Notes were issued in 1984 as a means of refinancing debt incurred by MSI following a leveraged buyout. At that time, purchasing the Notes was an investment involving significant risk at a high rate of interest since MSI was thinly capitalized and the interest coverage ratios were low at the time. Nevertheless the risks were disclosed as the securities were registered with the Securities and Exchange Commission.

11. On October 5, 1986 and thereafter, MSI failed to make the payments of interest required under Section 4.01 of the Indenture. These defaults have continued for thirty (30) days, thereby constituting Events of Default as defined in Section 6.01 of the Indenture.

12. MSI is not in compliance with the terms of other credit instruments and documents relating to the obligations of MSI to other creditors. Such failures to comply with the terms of those instruments and documents, if uncured, could become Events of Default as defined in Section 6.01(4) of the Indenture. Certain other creditors of MSI have indicated to MSI a possible stabilization of credit arrangements with MSI, subject to an appropriate resolution of the defaults presently existing under the Indenture. Absent a resolution of the defaults under the Indenture, stabilization of credit arrangements among MSI and its creditors does not appear to be possible, and liquidation of MSI appears to be the likely result.

13. Under current circumstances, MSI is unable to meet its principal and interest obligations on the Mortgage Notes when due. The audited financial statements of MSI for the fiscal year ending January 30, 1988, indicate that MSI had a shareholder deficiency of approximately $14,500,000 (CDN) as of that date. PX 9.

14. On October 15, 1986, November 17, 1986, and November 18, 1986, MSI wrote to the registered holders of Mortgage Notes, reporting its inability to make the payment required on the Mortgage Notes and advising of its efforts to resolve the defaults and improve its business prospects.

15. Upon the occurrence and continuance of an Event of Default, Section 6.02 of the Indenture provides that the Trustee (or the holders of not less than 25% in aggregate principal amount of the Mortgage Notes then outstanding) may declare the principal amount of all the Mortgage Notes, together with accrued and unpaid interest, to be due and payable immediately by notice in writing to MSI.

16. TDB, as Trustee, sent a notice of default dated November 18, 1986 to all registered holders of Mortgage Notes (the "Notice of Default"), a true and correct copy of which was attached to the Complaint and incorporated therein as Exhibit

C, PX 17. The Notice of Default gave notice of the existing default caused by MSI's failure to pay the interest payment due October 15, 1986. The Notice of Default also gave notice of a meeting of the Noteholders called by the Trustee and ultimately held on December 2, 1986. The December 2, 1986 meeting was attended by representatives of Noteholders holding a substantial portion of the principal amount of the Mortgage Notes, including CNA. At the meeting, the situation regarding the defaults of MSI was described to and discussed with the representatives of the Noteholders attending the meeting.

17. Prior to the institution of this action, MSI indicated to the Noteholders and the Trustee that in the event that the holders of a specified percentage of the Mortgage Notes or the Trustee accelerated the indebtedness pursuant to Section 6.02 of the Indenture, MSI would not be able to pay the full amount of the accelerated indebtedness and extensive litigation might ensue. Because of the potential adverse effect of such litigation on MSI, the Noteholders, and other creditors of MSI, and in an attempt to avoid expensive and time consuming litigation among MSI, the Noteholders, the Trustee, and other creditors, CNA and certain other Noteholders who collectively owned beneficially over 83% of the principal amount of the Mortgage Notes (the "Noteholder Group"), through their counsel and representatives, engaged in settlement discussions with MSI.

18. During the pendency of settlement negotiations Keith Van Beek and William D. Chalmers, respectively the current and former chief executive officer of MSI, owned the sole share of MSI Western Shareholdings, Inc. which itself owned the entire equity interest in MSI. It was the interests of Van Beek and Chalmers that were principally represented on the other side of the settlement negotiations with the Noteholders.

19. Since September 30, 1987 the share of MSI Western Shareholdings, Inc. has been held in trust for the Noteholders pending consummation of the Proposed Settlement.

20. In an effort to resolve the existing defaults to the satisfaction of all parties and to avoid the need for acceleration of MSI's indebtedness under the Indenture, counsel for MSI and counsel for the Noteholder Group thereafter engaged in extensive settlement discussions.

21. Pursuant to written notice dated March 27, 1987 to all registered Noteholders from MSI, a true and correct copy of which was attached to the Complaint as Exhibit D and incorporated therein, PX 18, on April 8, 1987, certain of the Noteholders and their representatives met in Chicago with representatives of MSI and the Trustee for the purpose of discussing various settlement proposals and alternatives available to the various persons. MSI made available to the Noteholder Group and their advisors financial and business information to aid in the Noteholders' analysis of the proposals and alternatives. The proposal made by MSI at that meeting, together with the financial and business information made available, was sent to all registered Noteholders by the Trustee at MSI's request, by letter dated April 10, 1987, a true and correct copy of which was attached to the Complaint as Exhibit E and incorporated therein, PX 19.

22. On April 15, 1987, MSI and representatives of the Noteholder Group tentatively agreed in principle upon the terms of a proposed settlement, subject to notice to all Noteholders and court approval. The preliminary terms of the proposed settlement were described in a Final Statement of Settlement Term Sheet of April 15, 1987 in Order to Avoid Default Litigation (the "Term Sheet"), a true and correct copy of which was attached to the Complaint and incorporated therein as Exhibit F, PX 4. Thereafter, the Noteholder group agreed in principle to the preliminary terms of the proposed settlement, as embodied in the Term Sheet, and directed implementation thereof, including preparation of appropriate documentation.

23. On September 8, 1987, after extensive and complicated negotiations concerning the proposed settlement, including consideration of Canadian and United States

legal issues in respect thereof, MSI and representatives of the Noteholder Group reached an agreement in principle as to the then definitive terms of the proposed settlement, subject to notice to all Noteholders and court approval. The then definitive terms of the proposed settlement were embodied in a proposed Agreement of Settlement Among Macleod–Stedman, Inc. and The Toronto–Dominion Bank Trust Company as Trustee and Certain Note Investors, dated September 8, 1987 (together with its exhibits, the "Initial Agreement of Settlement"), a true and correct copy of which was attached to the Complaint and incorporated therein as Exhibit G, PX 5. Thereafter, the Initial Agreement of Settlement was submitted to the Noteholders for their consideration, and holders of the beneficial interest of a substantial majority in principal amount of Mortgage Notes outstanding consented in principle thereto together with such modifications thereto as may be necessary, appropriate, and agreeable to counsel for a majority of the Noteholders, and directed and instructed TDB, as Trustee, to join in the final Agreement of Settlement, cooperate with Noteholder counsel in the implementation thereof, and commence this litigation in conjunction with the Noteholders.

24. This action was filed initially on November 16, 1987. Thereafter, it became apparent to MSI, the Trustee, and the Noteholder Group that the proposed settlement as embodied in and contemplated by the Initial Agreement of Settlement would require certain modifications. In response thereto, CNA and representatives of other Noteholders began negotiations with MSI for modifications to the Initial Agreement of Settlement which CNA believed would be agreeable to those Noteholders who executed and delivered the consents attached to the Complaint as Group Exhibit H, PX 20. The terms of these modifications together with the prior agreements are embodied in a revised proposed final Agreement of Settlement (together with its exhibits, the "Final Agreement of Settlement"), PX 7, to be entered into among MSI and those Noteholders who consent thereto and thereby agree to become the "Note Investors," as defined therein. The Final Agreement of Settlement has further been set forth in the following settlement documents (some of which are exhibits to the Final Agreement of Settlement and all of which are hereinafter collectively referred to as "Settlement Documents"):

a. Method of Calculating Excess Earnings, PX 10.

b. Provisions of Rights of Exchangeable Preferred Stock, PX 23.

c. Forecasted and Projected Financial Statement, PX 11.

d. Restructure Note Indenture, PX 24.

e. Measurement of Restructuring Objectives, PX 12.

f. Pro forma Balance Sheet as of January 30, 1988 and Letter of KMG Peat Marwick, PX 13.

g. Woods Gordon Liquidation Analysis, PX 14.

h. Shareholders' Agreement, PX 25.

i. Restructure Trust Agreement, PX 26.

j. Description of Registration Rights, PX 27.

k. Onex Agreement, PX 28.

l. Description of Agreement with Certain Former President, PX 29.

m. Canadian Deed of Trust, PX 30.

The Settlement Documents have all been submitted to and on file with the court since May 20, 1988, and the court has reviewed the Settlement Documents. Each of the terms "Proposed Settlement" and "Restructuring," as used herein, means the transactions substantially in the form contemplated by and provided for in the Final Agreement of Settlement and the Settlement Documents.

25. The Proposed Settlement has been accepted by MSI.

26. The Proposed Settlement has also been accepted by the holders of 100% in principal amount of the Mortgage Notes, as is indicated by the execution by them or their duly authorized representatives of the Powers of Attorney which accompanied the Notice (collectively, the "Power of Attorney") appointing Robert E. Wetzel and

Asher O. Pacholder as attorneys-in-fact (the "Noteholder Representatives") PX 22.

27. The Proposed Settlement primarily involves the issuance of certain debt and equity securities in exchange for the Mortgage Notes, including the claim for defaulted interest thereon. More particularly, MSI will acquire and cancel the $30,000,000 (U.S.) in principal amount of Mortgage Notes, including all claims for accrued and unpaid interest thereon, in exchange for, *inter alia:*

a. certain assurances as to the majority of outside independent directors;

b. the appointment of a new board of directors satisfactory to the management of MSI and to a majority of the Noteholders;

c. an aggregate principal amount of $18,000,000 (U.S.) Restructure Notes, Series A of MSI to be entitled to the benefit of the security described below, bearing interest at the rates of:

| | |
|---|---|
| Prior to 4/15/89 | 0% |
| 4/15/89 to 4/14/90 | 3% |
| 4/15/90 to 4/14/91 | 5% |
| 4/15/91 to 4/14/92 | .7% |
| 4/15/92 to 4/14/93 | 9% |
| 4/15/93 to 4/14/94 | 10% |
| 4/15/94 to 4/14/95 | 11% |
| 4/15/95 to 4/14/96 | 12% |
| 4/15/96 to 4/14/97 | 13% |
| 4/15/97 and thereafter | 15.5% |

There is also contingent interest accruing at the rate of 5% per annum from April 15, 1987 to April 15, 1996.

d. $12,000,000 (U.S.) in liquidation value of Exchangeable Preferred Stock of MSI, which may be exchanged by MSI upon certain conditions for Restructure Notes, Series B in the principal amount of $12,000,000 (U.S.) which, upon issuance will be entitled to the benefits of the security, ratably with Restructure Notes, Series A;

e. a deed of trust, executed by MSI and registered and recorded in such jurisdiction and with such authorities as may be necessary or desirable to constitute (i) a valid, fixed, and specific mortgage and charge of the same (or superior) priority of lien on certain real properties of MSI and the Subsidiaries as the fixed charge under the deed of trust currently securing the Mortgage Notes and (ii) a valid floating charge or security interest on certain real property and the personal property of MSI and the Subsidiaries, pursuant to which deed of trust a new bond shall be pledged to the Restructure Note trustee to secure the performance of MSI and the Subsidiaries under the Restructure Notes, Series A and the Restructure Notes, Series B; and

f. certificates of beneficial interest (the "Certificates of Beneficial Interest") representing 100% of the beneficial interest in a trust (the "Restructure Trust") the assets of which will initially consist of 85% of the then outstanding Common Stock of MSI (the "Newly Issued Common Stock") and $300,000 (U.S.), with rights in MSI's management to earn up to 15% of the Newly Issued Common Stock from the Restructure Trust upon the achievement of certain specified performance goals.

The term "New Securities," as used herein, means collectively the Restructure Notes, Series A, the Exchangeable Preferred Stock, the Newly Issued Common Stock, and the Certificates of Beneficial Interest.

28. The original complaint in this case was filed by CNA on November 16, 1987. The action was brought as a class action with CNA as the class representative of all beneficial holders of the Mortgage Notes. At the time filed, holders of 89% of the face value of the Mortgage Notes had accepted in principle the Initial Settlement. The trustee would not execute the documents necessary to complete the settlement principally because it believed the settlement adversely affected rights of the nonconsenting Noteholders which were protected by the Indenture itself and the Trust Indenture Act of 1939 ("TIA"), 15 U.S.C. §§ 77aaa–77bbb. In the original complaint CNA sought a declaratory judgment as to the rights of the Noteholders including a fairness hearing under § 3(a)(10) of the 1933 Act. CNA sought class certification with a no opt out class as a means of avoiding any requirement of consent mandated by the Indenture or TIA. Without issuing an opinion or ruling on class certifi-

cation, the court indicated its conclusion that the Indenture and the TIA required that any Noteholder who was part of the settlement had to consent to it and that class certification could not be used to avoid this requirement. CNA subsequently withdrew its request for class certification and amended the complaint to its present form after obtaining consents to the Proposed Settlement from all Noteholders. The settlement is contingent on court approval of the fairness of the settlement. The Amended Complaint seeks a fairness hearing pursuant to § 3(a)(10) of the 1933 Act. MSI, CNA, and all the Noteholders consented to this settlement before the Amended Complaint was filed. In its Answer to the Amended Complaint, MSI did not deny any allegations of the Amended Complaint and requested substantially the same relief CNA requested in the Amended Complaint. In its Answer to the Amended Complaint, TDB asserted it lacked knowledge to admit or deny most of the allegations. MSI and TDB also filed crossclaims against each other. MSI claims TDB caused damage to MSI by conduct that delayed the consummation of the settlement. This includes allegations that TDB has not cooperated in performing its duties under the Indenture as regards the Proposed Settlement and allegations that TDB has not followed the Noteholders' instructions as regards the Proposed Settlement. TDB has denied these allegations. In its crossclaim, TDB claims that, in violation of the Indenture, MSI has refused to pay expenses TDB has incurred in participating in the settlement process and this litigation. These claims remain unresolved. At the fairness hearing, MSI and CNA presented evidence and made arguments in favor of a finding of fairness. TDB presented additional evidence, some of which tended to make the Proposed Settlement appear less advantageous and some of which tended to make the Proposed Settlement appear to be more advantageous. As regards the fairness of the Proposed Settlement, TDB has taken no position. TDB has taken the position that no case or controversy exists. No party presented any evidence during the fairness hearing that subsequent to obtain-

ing the consent of all Noteholders TDB has been requested to participate in consummating the Proposed Settlement and has refused to do so. The counsel for MSI and CNA have made such representations in court and TDB's counsel has made representations that the Noteholders have not made any clear and express requests for TDB to take actions to consummate the Proposed Settlement. Throughout this litigation, though, it has been clear that MSI and CNA on the one side and TDB on the other have disagreed over the procedures to follow in this suit and in consummating the settlement. The court finds that a dispute continues to exist over TDB's participation in consummating the Proposed Settlement.

29. As a means of obtaining consent to the settlement by 100% of the Noteholders, Pacholder and Associates or its affiliates purchased $1,600,000 in face value of Mortgage Notes from Noteholders not agreeable to the settlement. The price paid was 50% and 60% of the face value of the Mortgage Notes.

30. D.I. Richardson, an expert witness for MSI, is an accountant chartered in Canada with substantial experience in the liquidation of Canadian corporations. He was hired by the Bank of Montreal, MSI's primary secured lender, and produced for them a report estimating the effect of a liquidation of MSI on the Bank of Montreal's secured loan. Richardson subsequently produced for MSI a report evaluating the liquidation value of MSI as regards the Mortgage Notes before and after restructuring, as of August 1, 1987. PX 14. He estimated that liquidation before restructuring would result in a recovery of 39.9 cents per dollar principal amount of the Notes. As a range he estimated a low of 30 cents and a high of 50 cents. He also testified that as of the date of the hearing, his estimation of the likely recovery would be somewhat higher than in the report because of changes in the exchange rate of Canadian and United States currency. He did not believe the amount of recovery would vary much depending on when the liquidation occurs. Daniel Scouler, an ex-

pert witness for TDB, is an accountant chartered in Canada and licensed in the United States and also a Canadian licensed trustee in bankruptcy. He analyzed Richardson's report, but made no direct investigation of the facts underlying the report. He made adjustments to the high range given by Richardson based on current exchange rates, some updated appraisals, a better return on receivables, and the elimination of all of Richardson's contingencies. On the low end of the range, he believed the 39.9% return should be the low end. Scouler's analysis did not permit him to estimate the probability of any particular result. He estimated a range of recovery of 40–80% of the principal value of the Mortgage Notes.

31. Richardson's principal obligation was to the Bank of Montreal who, like MSI to whom Richardson owed a lesser obligation, would be interested in conservative estimates of the liquidation value of MSI. Richardson's estimates tended to be low and did not take into account current exchange rates. Scouler's adjustment to the upper range of liquidation value were all proper adjustments. The upper end, while possible, is very unlikely since it assumes, as it should, that everything that could increase the liquidation value occurs. The court finds that liquidation of MSI at this time would not likely result in a recovery for the Noteholders of more than 50% of the face value of the Notes. There is a possibility of a recovery of as much as 60% and a limited possibility of a recovery above that amount. There is a possibility of a recovery as low as 40% and a limited possibility of a recovery of less than that.

32. After restructuring, the Noteholders would have Restructured Notes with a face value equal to 60% of the face value of the current Mortgage Notes. In the event of a default and liquidation, the Noteholders would have a secured interest in the amount of the face value of the Restructured Notes plus interest in the amount of 5% per annum retroactive to April 15, 1987. Since it is unlikely that the Noteholders' recovery would exceed 50% of the face value of the current Mortgage Notes and very unlikely that it would exceed 60% of the face value of the current Mortgage Notes, the Noteholders secured interest after restructuring is likely to be more than sufficient to ensure that, in the event of liquidation, the Noteholders would recover the same amount after restructuring as they would before restructuring. The Restructuring therefore involves diminished risk that the Noteholders would lose additional amounts even if the Restructuring only results in postponing the eventual liquidation of MSI.

33. The Noteholders explored alternatives to the Proposed Settlement, including the sale of all or parts of MSI as a going concern, the sale of the Mortgage Notes, and the liquidation of MSI. Each of these alternatives was less attractive than the Proposed Settlement. See Exhibits prepared by Ernst & Whinney, including Post–Restructuring Analysis, PX 15; Valuation of New Securities, PX 16; Restructuring Attributes, PX 32; Analysis of Going Concern vs. Liquidation, PX 33; Cash Flow Analysis of Restructured Securities, PX 34; and Incremental Value Comparison, PX 35, and the testimony of C. Kevin White and Daniel Scouler. The value to the holders of the New Securities to be received in the Proposed Settlement is likely to vary from a low of 50 cents per dollar principal of Mortgage Notes exchanged to a high of 83 cents per dollar principal of Mortgage Notes exchanged, with 67 cents per dollar principal of Mortgage Notes exchanged being the most likely based upon MSI's cash projections, which in turn are based on no increase in business. There is still, however, a substantial risk that MSI will not be able to survive as a going concern after restructuring and will eventually be liquidated. The New Securities will be highly speculative. Two different buyers expressed an interest in buying the Mortgage Notes for 55% of the face value, but these expressions of interest never materialized into offers. The Noteholders are not likely to find offers of similar amounts except with contingencies or conditions that would make the offer unattractive.

34. The present value of the Mortgage Notes in liquidation is likely less than the

probable value of the New Securities and the Noteholders will not give up any security of MSI in the event of a liquidation after the Restructuring because of the substantial "cushion" represented by the aggregate principal amount of Restructure Notes, Series A over the net realizable value of the assets securing such notes. There is also potential for increased value in the New Securities, through excess earnings interest on the Restructure Notes and in the value of the Newly Issued Common Stock if MSI performs well after the Restructuring. While no new cash comes into MSI as a result of the Restructuring, completion of the Restructuring coupled with several consecutive quarters of operations within a reasonable range of its projections for such periods would create an environment in which it is reasonable to assume that financing to provide additional working capital on acceptable terms might become available to MSI. MSI's projections appear to be reasonable.

35. Having heard and weighed the evidence, the court finds by the preponderance of the evidence that: (i) the probable value of the New Securities to be received by the Noteholders in the Proposed Settlement is greater than the recovery which the Noteholders would likely receive were MSI liquidated without a restructuring; (ii) after completing the Restructuring, MSI is likely to be able to continue in business as a going concern with a positive shareholder equity; (iii) the net recovery to the holders of the Restructure Notes, Series A in the event of a liquidation of MSI immediately after completing the Restructuring is likely to be substantially the same as the net recovery to the Noteholders from liquidation of MSI immediately prior to the Restructuring, and there is diminished likelihood of a material decline in such net recovery in the year following implementation of the Restructuring; and (iv) there is no firm, feasible, and currently available alternate solution to the defaults on the Mortgage Notes except for the Restructuring or liquidation of MSI.

36. Further, the Proposed Settlement has the following benefits, including without limitation:

a. This resolution of the defaults under the Indenture provides an equity infusion to MSI through the exchange of $30,000,000 (U.S.) principal amount of Mortgage Notes (including accrued and unpaid interest) for New Securities, including: (i) Restructure Notes, Series A, in the total principal amount of $18,000,000 (U.S.) and (ii) the Exchangeable Preferred Stock, which is exchangeable at the option of MSI in certain circumstances for Restructure Notes, Series B, in the total principal amount of $12,000,000 (U.S.).

b. The possibility that the Noteholders may receive a return of the full amount of the original principal amount of their investment if MSI performs well following the debt restructuring is preserved, and MSI is given the incentive to maximize its performance through the waiver of 5% per annum contingent interest if the obligations in respect of the Restructure Notes and Exchangeable Preferred Stock are met.

c. Meaningful financial covenants have been negotiated which grant to MSI the flexibility to manage and maximize its business while providing some assurance to holders of Restructure Notes that the operations of MSI will not jeopardize their investment.

d. The near term cash requirements of MSI are assisted by the substantial reduction of the cash flow required to be devoted to interest in the early term of the Restructuring and by the agreement to permit proceeds from sale of certain of the real property collateral to be used to pay certain of the expenses of the Proposed Settlement which are the obligation of MSI, to be returned to the collateral pool from future excess earnings.

e. MSI will be permitted to merge (amalgamate) with its real estate subsidiaries and thus realize a significant cash savings by use of the parent's past operating losses to offset certain profits which may be generated from the assets of the Subsidiaries.

f. The Proposed Settlement will help MSI to normalize and stabilize its relations with trade suppliers and its banker.

g. The consummation of the Proposed Settlement will avoid the possibly disruptive effects of outstanding obligations to a former shareholder, Onex Capital Corporation, and other third parties by allowing completion of arrangements for the waiver of certain management fees and the termination of an outstanding option to acquire ownership of MSI, all of which arrangements are or are to be satisfactory to a majority of Noteholders.

h. The Restructured Notes may have a greater market value than the current Mortgage Notes.

37. The Proposed Settlement has the potential risk of simply resulting in a postponement of the liquidation of MSI and a delayed and decreased recovery for the Noteholders compared to the recovery from a liquidation begun now.

38. By its terms, the Proposed Settlement is conditioned upon an entry of an order by this court approving the terms and conditions of the issuance of the New Securities in exchange for the Mortgage Notes, including all claims for accrued interest thereon, after holding a hearing on the fairness of such terms and conditions at which all of the Noteholders have the right to appear. It is further conditioned on the time for appealing the order having expired without an appeal and the order being entered in a form satisfactory to counsel for MSI and the Noteholders. Additionally, it is conditioned on no further approval, authorization, consent, filing or other order of any governmental body being legally required for issuance or delivery. PX 7, §§ 1.14, 7.6(h), 9.1(g). The findings and conclusions as to fairness, therefore, may enable the Noteholders to agree to consummate a settlement.

39. CNA and Pacholder believe that the Proposed Settlement is the only currently available alternative to acceleration under the Indenture. There is no evidence that any Noteholders believe otherwise.

40. CNA has taken all action it believes appropriate in order to obtain for the Note-holders the most favorable resolution of the MSI problems that is possible. After participating in extensive settlement negotiations and assessing the situation to the best of its ability, CNA believes that the Proposed Settlement is the most favorable resolution of the problems available to the Noteholders at this time. CNA especially believes the Proposed Settlement to be fair to the holders who consent thereto, and to be superior to the acceleration of the indebtedness under the Indenture and exercise of remedies, such as foreclosure and liquidation of MSI. CNA does not know of any other available alternative resolution of the problems which is achievable, a better resolution for the Noteholders, and acceptable to MSI. By their agreement to the terms of the Proposed Settlement, CNA believes that the holders of the beneficial interest in 100% of the principal amount of the Mortgage Notes share these views.

41. Despite its apparent benefits, the Proposed Settlement involves the substantial restructuring of the Mortgage Notes and will irrevocably alter the nature of the securities held by the Noteholders who consent thereto as well as the relationships of such persons with other creditors and MSI. The negotiations demonstrated many of the difficulties facing MSI and the Noteholders. The uncertainty of the future of MSI made it difficult to find qualified persons willing to serve as directors, necessitating a reduction in the size of the board to five directors rather than the seven called for by the Term Sheet. MSI's bank lender refused to increase existing credit lines or advance rates on collateral, although it entered into new loan documentation which cures existing defaults. Management incentives were made more favorable to assure that MSI will be operated by capable personnel. Canadian securities laws, in effect, required orders from Canadian securities regulatory authorities, and United States securities laws necessitated the inclusion of registration rights to provide liquidity to holders of New Securities. The anticipated completion date of July 1, 1987 became unrealistic in light of the complex issues requiring resolution. Noteholders in

effect have been required to help fund certain of the expenses of the Restructuring by use of a portion of their collateral, given the significant size of these costs. Regulatory compliance with Canadian statutes, including the Investment Act (Canada) and the Competition Act (Canada) has been required. The resignation of the then chief executive officer of MSI required both retention of additional capable management and also difficult negotiations to insure that the Proposed Settlement was not affected adversely. Both Canadian and United States tax law required careful review. In hindsight, it now appears that seeking to register the securities and proceeding before the Securities Exchange Commission may have been less costly and less time consuming. However, it was reasonable to believe that proceeding in court would be the more economical means. The expenses incurred in consummating this settlement, estimated to be about $5,000,000, are high but not unreasonable.

42. In addition, the negotiations which followed the Initial Agreement of Settlement for modifications which are embodied in the Final Agreement of Settlement highlight the benefits of the Proposed Settlement to the parties as well as the continued need for the Restructuring:

    a. The unanimous consent of the Noteholders to the Initial Agreement enables the Proposed Settlement to contemplate an exchange binding upon all Noteholders, simplifying the court approval process substantially.

    b. Rather than amalgamation of MSI with the Subsidiaries at consummation of the Proposed Settlement, amalgamation will be deferred until after consummation of the debt restructuring.

    c. Funding by Noteholders through use of proceeds of their real estate collateral to acquire the indirect interest of a certain former chief executive officer in the capital stock of MSI is no longer necessary.

    d. Certain ambiguities in drafting have been clarified and conditions not capable of fulfillment have been modified so as to remove impediments to consummation of the Restructuring.

The possibility that the Initial Agreement of Settlement might require modifications similar to those described above was contemplated.

43. On May 4, 1988, CNA caused the Notice, including its accompanying documents, in the form approved by this court on May 2, 1988, PX 6, 7, 8, and 21 (collectively, the "Notice"), to be delivered to all of the Noteholders, PX 31. The Notice notified all of the Noteholders as to the time and place of the hearing on the fairness of the terms and conditions of the issuance and exchange of securities contemplated by the Proposed Settlement (the "Fairness Hearing"), informed each Noteholder of his right to appear at the Fairness Hearing, and provided an adequate summary of the Proposed Settlement, PX 6. The Restructuring Memorandum dated May 4, 1988 (the "Restructuring Memorandum"), PX 8, which accompanied the Notice provided detailed information with respect to all aspects of the Proposed Settlement, historical and pro forma financial information concerning MSI and the business and management of MSI, detailed descriptions of the New Securities and the Mortgage Notes, and other matters which may assist a holder of Mortgage Notes in making the investment decision whether to consent to the Final Agreement of Settlement.

44. On June 16 and 17 and July 6 and 7, 1988, the court conducted the Fairness Hearing. CNA, MSI, and the Trustee each presented evidence at the hearing. No Noteholder to whom it is proposed to issue New Securities in the Proposed Settlement appeared at or gave testimony relating to the Fairness Hearing other than CNA and Pacholder. Pacholder, whose firm is a holder of Mortgage Notes, the investment advisor to certain other Noteholders, and who is to become a director of MSI upon consummation of the Proposed Settlement, appeared solely through his evidentiary deposition taken by the Trustee and filed with the court.

45. The exchange of securities provided in the Proposed Settlement is intended by MSI and the Noteholders to be a contempo-

raneous exchange for new value given to MSI, and such exchange is in fact a contemporaneous exchange for new value given to MSI.

## CONCLUSIONS OF LAW [1]

■ Jurisdiction of this action is based upon 28 U.S.C. § 1331 in that this action involves a federal question concerning the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. §§ 77a *et seq.* Jurisdiction is also based upon 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties in this case and the amount in controversy exceeds $10,000.[2] Subject matter jurisdiction is also based on 28 U.S.C. §§ 2201 and 2202 in that CNA and MSI seek a declaratory judgment. This court also has *in personam* jurisdiction over all parties and this district is a proper venue.

Before proceeding further, this court must consider whether it has proper jurisdiction in that there is a "case or controversy" before it. *See Hodel v. Irving,* 481 U.S. 704, 107 S.Ct. 2076, 2080, 95 L.Ed.2d 668 (1987). This issue was initially raised by the court and the Trustee subsequently argued that there is no case or controversy.[3] Although the court ruled in December 1987 that a case or controversy existed, circumstances have changed since that time. While it would be unfortunate, in light of the time and expense already devoted to this case, to now hold that no case or controversy exists, a serious question as to that issue exists and it cannot be ignored. *See Kremens v. Bartley,* 431 U.S. 119, 136, 97 S.Ct. 1709, 1719, 52 L.Ed.2d 184 (1977). The question is a close one, but the court concludes that a case or controversy exists.

The test to be applied to determine the existence of an actual controversy can be stated simply. The test is whether "there is a substantial controversy, between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941). *Accord Preiser v. Newkirk,* 422 U.S. 395, 402, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975); *Alcan Aluminum Ltd. v. Department of Revenue of State of Oregon,* 724 F.2d 1294, 1298 (7th Cir.1984); *Nuclear Engineering Co. v. Scott,* 660 F.2d 241, 252 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). "While this test may be easily stated, it is often difficult to apply to a given factual pattern." *Scott,* 660 F.2d at 252. The difference between an abstract question and a controversy is one of degree that is difficult to define. *Maryland Casualty,* 312 U.S. at 273, 61 S.Ct. at 512.

■ With the above limitation in mind, the court still looks to the often quoted passage in *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937), for the general principles governing a determination of the existence of a case or controversy.

A "controversy" in this sense must be one that is appropriate for judicial determination. A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial contro-

---

1. Any finding of fact which is a conclusion of law shall be deemed to be a conclusion of law as if fully set forth therein. Any conclusion of law that is a finding of fact shall be deemed to be a finding of fact as if fully set forth therein.

2. There is complete diversity regardless of how the parties are aligned. Additionally, it appears that if the other Noteholders were found to be necessary parties, complete diversity would be destroyed. The other Noteholders, however, are not necessary parties. Their interests are adequately represented by CNA and there can be adequate relief without their joinder. *See* Fed.

R.Civ.P. 19(a). Rule 19 does not require they be joined as parties and they would not be held to be indispensable parties if that question needed to be reached.

3. The other parties have ridiculed the Trustee for pursuing this issue. The ridicule is unwarranted. The court would have raised the issue on its own if not briefed by the parties. Moreover, the question is a close one that could have gone against MSI and CNA. The briefs of all the parties, though, were not particularly helpful in deciding this question.

versy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Where there is such a concrete case admitting of an immediate and definitive determination of the legal rights of the parties in an adversary proceeding upon the facts alleged, the judicial function may be appropriately exercised although the adjudication of the rights of the litigants may not require the award of process or the payment of damages. And as it is not essential to the exercise of the judicial power that an injunction be sought, allegations that irreparable injury is threatened are not required.

Furthermore, the controversy must exist at all stages of the litigation, not merely at the time the complaint was filed. *Preiser*, 422 U.S. at 401, 95 S.Ct. at 2334 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216 n. 10, 39 L.Ed.2d 505 (1974)); *Blinder, Robinson, & Co. v. SEC*, 748 F.2d 1415, 1418 (10th Cir.1984), *cert. denied*, 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985). Also, "it is the nature of the controversy, not the method of its presentation or the particular party who presents it, that is determinative." *Aetna Life*, 300 U.S. at 244, 57 S.Ct. at 465.

When this case was first filed, it was clear that a case or controversy existed between CNA, as a Noteholder, and the Trustee. The Trustee was refusing to execute documents necessary to consummate the settlement because it believed to do so would violate the terms of the Indenture and the TIA. That is the controversy that this court found existed as of December 1987. Whether there was any case or controversy between MSI and CNA was and continues to be a more difficult question. MSI might have been more properly aligned as a plaintiff opposing the Trustee's refusal to consummate the settlement. *See, e.g., First National Bank of Shawnee*

*Mission v. Roeland Park State Bank & Trust Co.*, 357 F.Supp. 708, 711 (D.Kan. 1973). Subsequent to December 1987, consent to the settlement by all Noteholders was obtained and the controversy between CNA and the Trustee appeared to cease and essentially was amended out of the complaint. The crossclaim of MSI against the Trustee, however, alleges a continuing dispute over the Trustee's role in the settlement and the court has found such a dispute still exists between the Trustee and the other two parties. It is first considered whether the dispute between the Trustee and the other parties constituted a sufficient dispute to establish a case or controversy for purposes of holding the fairness hearing. Second, the court considers whether there is a sufficient dispute between CNA and MSI to constitute a case or controversy.[4]

As stated above, a controversy must continue to exist throughout the litigation. Where a particular controversy has been amended out of the complaint, it ordinarily will not be the basis for a continuing controversy. *See Sarafin v. Sears, Roebuck & Co.*, 446 F.Supp. 611, 613–14 (N.D.Ill. 1978). The court, however, has found that there has been a continuing dispute over the Trustee's participation in the settlement proceeding. Presumably, if the Trustee refused to participate in the settlement because it believed the settlement to be unfair or the settlement to be a violation of registration requirements and these were valid grounds for refusing to participate, resolving the dispute between the Trustee and the other two parties might require a finding as to whether or not the settlement was fair. But as the dispute now stands, a fairness hearing is not necessary for resolving it. There is no indication the Trustee is refusing to participate or cooperate because it believes the settlement to be unfair. The dispute concerning the Trustee's participation cannot be the basis for the case or controversy require-

---

4. The Trustee has also argued there is no case or controversy because the Noteholders already own the shares of MSI and therefore CNA is essentially suing itself, which is not permitted. *See South Spring Hill Gold Mining Co. v. Ama-* *dor Medean Gold Mining Co.*, 145 U.S. 300, 12 S.Ct. 921, 36 L.Ed. 712 (1892). The evidence, however, shows the settlement has not yet been consummated and therefore the Noteholders do not yet own MSI.

ment as to a fairness hearing. The court therefore must determine if there is a sufficient dispute between CNA and MSI to constitute a case or controversy.

The question of whether the settlement is fair is an issue appropriate for judicial determination. For example, pursuant to Fed.R.Civ.P. 23(e), courts are often called upon to make such a determination. The question of the fairness of the settlement is not a hypothetical or abstract question, but one concerning qualifications for nonregistration of securities the resolution of which will have a concrete effect on the parties. The settlement itself is also concrete, not a mere hypothetical possibility. The problem as regards the case or controversy issue is whether CNA and MSI can be considered to have adverse interests in the litigation, which is a necessary component of the case or controversy requirement. *See Muskrat v. United States*, 219 U.S. 346, 361, 31 S.Ct. 250, 255, 55 L.Ed. 246 (1911); *South Spring*, 145 U.S. at 301, 12 S.Ct. at 921; *Lord v. Veazie*, 49 U.S. (8 How.) 251, 254–55 (1850); *Granfield v. Catholic University of America*, 530 F.2d 1035, 1045 (D.C. Cir.), *cert. denied*, 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *Dworman v. Mayor & Board of Aldermen of Morristown*, 370 F.Supp. 1056, 1080 (D.N.J.1974).

■ If CNA, another Noteholder, or the Trustee on behalf of the Noteholders had filed suit to collect the unpaid interest on the Notes or accelerate payment of the principal and a tentative settlement had been reached, there would be a case or controversy. A case does not become moot because a tentative settlement has been reached. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 465 n. 3, 98 S.Ct. 2454, 2456 n. 3, 57 L.Ed.2d 351 (1978). Similarly, a case or controversy still exists when a settlement has been reached subject to court approval. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 371 n. 10, 102 S.Ct. 1114, 1120 n. 10, 71 L.Ed.2d 214 (1982). Moreover, a court can enter judgment in pending litigation on the basis of a settlement agreement; the court does not lose

its jurisdiction immediately upon the settlement of the case. *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir.1978). Thus, the mere existence of a tentative settlement does not necessarily mean there is no case or controversy. But determining whether a case or controversy exists is a matter of degree. There is a difference between a lawsuit disputed when it is filed in which a tentative settlement is reached and a lawsuit which is a tentative settlement from the moment it is filed and in which the defendant admits every allegation of the complaint and seeks the same relief as the plaintiff. *See Pennsylvania Association for Retarded Children v. Commonwealth of Pennsylvania*, 343 F.Supp. 279, 290 (E.D.Pa.1972).

■ The court has found four categories of cases which the present case might be considered to fall into. As already mentioned, tentative settlements do not end a case or controversy. *See Coopers & Lybrand, supra*. Another category of cases are those in which a complaint seeking an injunction is filed simultaneously with a consent decree settling the suit. *See Swift & Co. v. United States*, 276 U.S. 311, 326, 48 S.Ct. 311, 315, 72 L.Ed. 587 (1928); *SEC v. Randolph*, 736 F.2d 525, 528 (9th Cir. 1984). In both of those cases, the government filed enforcement actions simultaneous with consent decrees in which the defendants agreed to refrain from unlawful activity. In both cases, the defendants also denied the allegations of the complaint.[5] It was held that controversies existed because of the potential for future violations. A third category of cases is represented by *Tutun v. United States*, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738 (1926). In that case the Supreme Court held that a naturalization proceeding was a case or controversy. The Court reasoned as follows:

... Whenever the law provides a remedy enforceable in the courts according to the regular course of legal procedure, and that remedy is pursued, there arises a case within the meaning of the Consti-

---

5. In the *Randolph* case, this fact is stated in the district court opinion. *SEC v. Randolph*, 564 F.Supp. 137, 139 (N.D.Cal.1983), *rev'd*, 736 F.2d 525 (9th Cir.1984).

tution, whether the subject of the litigation be property or status. A petition for naturalization is clearly a proceeding of that character.

The petitioner's claim is one arising under the Constitution and laws of the United States. The claim is presented to the court in such a form that the judicial power is capable of acting upon it. The proceeding is instituted and is conducted throughout according to the regular course of judicial procedure. The United States is always a possible adverse party.

*Id.* at 577, 46 S.Ct. at 427. *Tutun* does not state whether the United States actually opposed the petition in that case. However, it has been read as holding that a court can grant a certificate of naturalization even though there is no opposition, C.A. Wright, A. Miller, E. Cooper, *Federal Practice & Procedure*, § 3530 at 321 (2d ed. 1984), and the Court refers to the United States as "a possible adverse party" not an actual adverse party.

The above cases can be distinguished from the present case, but not necessarily to a degree that will make a difference. Certainly a case that is tentatively settled from the beginning represents less adversity than a case that was originally fully disputed. But a case or controversy must exist throughout the entire period of litigation. If a tentatively settled case is a live case or controversy at the end of a case, it can also be one at the beginning. Moreover, *Swift* and *Randolph* show that a case can be largely settled from the beginning. Those two cases rely on the possibility of a future violation just as *Tutun* relies on a possibility of opposition by the United States. *See also Muskrat*, 219 U.S. at 357, 31 S.Ct. at 254 ("present or possible adverse parties"). Of course, if the possibility of adversity is too remote, there is no case or controversy. *Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. at 512. But this case does not involve a remote possibility of a dispute if it cannot be settled with a fairness hearing. This case involves a genuine dispute over payments on the Mortgage Notes and the Proposed Settlement was reached only after arm's length negotiations between adverse parties. Also there

was the possibility that some Noteholder would object to the settlement and, indeed, some had to be bought out to obtain full consent. Furthermore, the parties continued to revise the settlement while this litigation was pending. Additionally, if this court required changes in the terms and conditions of the settlement for the settlement to be found fair, the adverse interests of the parties would come into play. As previously stated, there would clearly have been a case or controversy if this suit had been brought to collect unpaid obligations or to accelerate the Mortgage Notes. Although there is a tentative settlement, the obligations under the Indenture are still the dispute underlying the tentative settlement. And it is the nature of the controversy, not the method of presentation, that is determinative. *Aetna Life*, 300 U.S. at 244, 57 S.Ct. at 465.

The above cases, although distinguishable, indicate that the present case should be held to be a case or controversy. However, there is a fourth category of case that brings pause. The general rule is that where both parties "desire precisely the same result," which is true of this case, there is no case or controversy. *Moore v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 47, 48, 91 S.Ct. 1292, 1293, 28 L.Ed.2d 590 (1971) (per curiam). In *Moore*, both parties argued that, contrary to the district court's ruling in a companion case, *see North Carolina State Board of Education v. Swann*, 402 U.S. 43, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971), a state antibusing statute was constitutional. The Court found no case or controversy because both parties sought the same result. In *Brown v. Watkins Motor Lines, Inc.*, 596 F.2d 129 (5th Cir.1979), a guardian appointed by an Alabama court had brought a diversity suit on behalf of a minor plaintiff. The district court entered a judgment in favor of plaintiff following a jury verdict. The district court denied defendant's postjudgment motions and *sua sponte* retained "full jurisdiction of the administration and supervision of [Brown's] estate." *Id.* at 130 (quoting district court order). The district court denied a motion

to disburse the funds to an ancillary guardianship set up in Mississippi and unilaterally fixed the amount of attorney's fees at an amount less than the contingent fee arrangement with the attorney. The Fifth Circuit recognized that a court has the power to act on a petition for attorney's fees after a judgment is entered, *id.* at 131 n. 1, but, following *Moore, supra,* held that there is no case or controversy permitting such consideration when no party petitions the court and the parties do not disagree over the amount of fees. *Brown,* 596 F.2d at 131–32. In *Dworman v. Mayor & Board of Alderman of Morristown,* 370 F.Supp. 1056 (D.N.J.1974), a contractor and town sought a ruling that they could enter into a contract without public bidding. There was no dispute between the parties on that issue or on the terms of the contract. Citing *Moore, supra,* the court held that this "friendly suit" did not constitute a case or controversy and was only an attempt to avoid a future controversy with taxpayers. *Dworman,* 370 F.Supp. at 1080. In *Federal Land Bank of Columbia v. Shepard,* 646 F.Supp. 1145 (M.D.Ga. 1986), the plaintiff sought to enjoin one of the defendants from transferring certain property from a particular site. Since the defendant held the position that it could not transfer the property without authorization from plaintiff, the court found that both sides desired the same result and therefore there was no case or controversy. *Id.* at 1149.

There are, of course, exceptions to the "same result" rule. In *INS v. Chadha,* 462 U.S. 919, 939–40, 103 S.Ct. 2764, 2778, 77 L.Ed.2d 317 (1983), both the INS and Chadha argued before the Court of Appeals that Congress's legislative veto over INS's decision to suspend Chadha's deportation was unconstitutional. The Supreme Court held that a case or controversy nevertheless existed because, absent a favorable ruling, INS would have recognized Congress's veto and deported Chadha. Sim-

ilarly, in *GTE Sylvania, Inc. v. Consumers Union of the United States, Inc.,* 445 U.S. 375, 383, 100 S.Ct. 1194, 1200, 63 L.Ed.2d 467 (1980), the Court held there was a case or controversy even though both sides argued for the same result. Both sides agreed certain documents held by defendant Consumer Product Safety Commission should be released pursuant to the Freedom of Information Act. The Commission, however, would not release the documents absent a court order contrary to an injunction entered by another court in another case. In *Hoffert v. General Motors Corp.,* 656 F.2d 161, 165 (5th Cir.1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed. 2d 485 (1982), the Fifth Circuit held that once parties invoke a court's equitable jurisdiction to approve settlement, the court had the power to consider the propriety of all aspects of the settlement including portions of the settlement—in *Hoffert* the amount of attorney's fees—that had not been questioned by any party. The court distinguished *Brown, supra,* on the ground no party in *Brown* had sought approval of the attorney's fee award or any agreement as to attorney's fees. *Hoffert,* 656 F.2d at 165.[6]

The "same result" cases express a concern for decisionmaking without the usual clash of adverse views, collusiveness, and effects on parties not before the court. Courts, however, are frequently required to approve settlements in cases where no party objects to the settlement. Additionally, while the Trustee in this case did not oppose the settlement and did not, in light of certain limitations, attempt to bring out all possible facts, the Trustee did contribute an additional perspective to the case and the court found that the three parties adequately developed the facts of this case. While CNA and MSI could have presented a more balanced view of certain legal issues, they certainly did not go beyond the proper bonds of representing their clients

---

**6.** CNA also cited *Brimmer v. Thomson,* 521 P.2d 574 (Wyo.1974), as an exception to the "same result" rule. Following cases from other states, the Wyoming Supreme Court held that there was an exception to the adversity requirement in cases of great public import. *Id.* at 578. It is

doubtful that the present case would satisfy such an exception. More importantly, the federal courts do not recognize such an exception to the constitutional case or controversy requirement. *See Kremens,* 431 U.S. at 136, 97 S.Ct. at 1719.

to attempt to commit a fraud on the court. Moreover, the Trustee provided a balance of views on certain key legal issues so it was unnecessary for the other parties to do so. This is not a collusive case. As for an attempt to obtain an advantage over third parties, it has been found that the interests of the nonparty Noteholders were adequately represented. Other interested parties would be the SEC and any future holders of the Restructure Notes. The interests of any future holders is protected by the fairness hearing which serves disclosure purposes similar to registration. *See SEC v. Blinder Robinson & Co.,* 511 F.Supp. 799, 802 (D.Colo.1981). The court will not intrude on any area reserved for the SEC, *compare City of Peoria v. General Electric Cablevision Corp.,* 690 F.2d 116 (7th Cir.1982), and the SEC will likely still have the opportunity in a letter ruling to consider the issue of nonregistration.[7]

Unlike *Shepard, supra,* this case involves disputes over underlying obligations. Unlike *Dworman, supra,* this case involves an underlying dispute and does not involve a dispute that is actually between one of the present parties and a nonparty. Unlike *Brown, supra,* the court is not *sua sponte* considering the appropriateness of the settlement. Instead this case is more like *Swift, supra, Randolph, supra,* and *Hoffert, supra.* In light of the tentative nature of the settlement; the settlement's continuous revision; and a real and continuing—even if latent—dispute over obligations on the Mortgage Notes, the court holds that this action involves the necessary adversity for a case or controversy. As discussed above, the other requirements of a case or controversy are also met. The court holds there is a case or controversy before it.

■ The case or controversy issue, however, does not end the question of whether this is an appropriate case for ruling on the fairness of the settlement. There are also prudential limitations on declaratory relief. *See International Harvester Co. v. Deere & Co.,* 623 F.2d 1207, 1217–18 (7th Cir.

1980). A court should only exercise its discretion to issue a declaratory judgment "1) where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, or 2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Sarafin,* 446 F.Supp. at 615 (quoting *Maryland Casualty Co. v. Rosen,* 445 F.2d 1012, 1014 (2d Cir.1971)). A declaratory judgment would clarify the legal relations in issue and contribute to resolving the uncertainty, insecurity, and controversy involved in this case.

Another problem still exists that has not been previously considered by a court or the SEC. A leading commentator states it this way.

An interesting issue that has not yet been presented to the SEC staff is whether Section 3(a)(10) applies to so-called "boot-strapping" situations. Suppose, for example, that the parties to a dispute involving "one or more bona fide outstanding ... claims" have not yet reached the pleading stage when someone suggests a settlement arrangement that provides for the issuance of securities. Since the requirement under Section 3(a)(10) is for "approval ... by any court," may the parties simply petition a court that would otherwise have jurisdiction and is willing to cooperate to schedule the necessary fairness hearing and approve the settlement so that unregistered securities may be distributed? A policy favoring such an interpretation carries with it the danger that the exemption will be abused and that fraud or collusion among parties will be masked as they seek official sanction for an illegal distribution of securities. On the other hand, it seems ludicrous to require parties in this type of situation, who are acting in good faith, to take an unspecified number of procedural steps into litigation so that they can establish a sufficient nexus with a court to justify involving its help in a Section 3(a)(10) transaction.

---

7. The court asked the parties to inform the SEC that it would welcome its views and the parties

informed the court that the SEC declined to become involved.

7 J. Hicks, *Exempted Transactions Under the Securities Act of 1933*, § 3.02[4][b] at 3–46 to 3–47 (1984).

■ It is clear that § 3(a)(10) does not provide a mechanism for obtaining a fairness hearing. It is not a jurisdictional or procedural statute. Authority for the hearing must come from elsewhere. This court has the inherent authority to approve a settlement of litigation. Also, under the Declaratory Judgment Act, this court has the authority to rule on the issue before it in this case or controversy. There is no jurisdictional problem, it is only a prudential problem of whether this is an appropriate case in which to act. Section 3(a)(10) was intended primarily to offer financially troubled corporations an alternative to the burdens of registration. *Hicks* § 3.02; Ash, *Reorganizations and Other Exchanges Under Section 3(a)(10) of the Securities Act of 1933*, 75 Nw.U.L.Rev. 1, 9 (1980). Since the statute was designed for the present type of transaction and there is—in essence, if not form—an underlying unsettled dispute, the court exercises its discretion to provide a fairness hearing in the present situation. The court, however, does not believe it to be appropriate to hold that the new securities are not subject to registration. By its terms, § 3(a)(10) only requires approval by the court of the terms and conditions of the exchange. The court will make such a determination; an express determination as to the necessity for registration is more appropriately left for the SEC or any future dispute that may result from the exchange of the securities. If the parties desire further assurances, they have available to them the procedure of obtaining a no-action letter from the SEC. *Cf. Pittsburgh Terminal Corp. v. Baltimore & Ohio R.R.*, 586 F.Supp. 1297, 1304 (W.D.Pa.1984), *aff'd by unpublished opinions*, 760 F.2d 257, 260 (3d Cir.), *cert. denied*, 474 U.S. 919, 106 S.Ct. 247, 88 L.Ed. 2d 256 (1985).

The court also will not issue any order directing or authorizing MSI and the Trustee to consummate the Proposed Settlement. MSI has not indicated any unwillingness to consummate the Proposed Settlement. MSI, like the Noteholders, will be given the opportunity to evaluate today's order and determine if the order is satisfactory for consummating the Proposed Settlement. As for the Trustee, the parties have not presented any evidence as to the Trustee's purported noncooperation and have not presented the issue of the Trustee's affirmative obligations in consummating the Proposed Settlement. Any order directed toward the Trustee would certainly be premature at this time and may be unnecessary in any event.

The exemption under § 3(a)(10) applies to qualified exchanges when "the terms and conditions of such issuance and exchange are approved, after a hearing upon the fairness of such terms and conditions at which all persons to whom it is proposed to issue securities in exchange shall have the right to appear." As stated earlier, this court is ruling only on the fairness of the Proposed Settlement. The court makes no conclusion as to the ultimate issue of whether registration is required. This court need only consider whether the notice and opportunity to be heard was adequate (and thus fair) and whether the terms and conditions of the settlement are fair. *Cf. Hicks*, § 3.02[4] at 3–35.

The notice must go to all persons to whom it is proposed to issue securities and "at a minimum, the notice should clearly advise the prospective recipients of the nature of the pending action, the terms of the settlement (including the fact that unregistered securities will be issued), the location of more detailed information about the litigation and settlement that is available for inspection, the date, time, and place of the fairness hearing, and the fact that they have a right to appear and object." *Id.* at 3–37. *See also Blinder Robinson*, 511 F.Supp. at 800. These requirements were all satisfied. The Notice went to all registered and beneficial Noteholders well in advance of the hearing and they were advised of the dates and times of the hearing, their opportunity to appear, and where more information could be obtained. Especially in light of the sophisticated nature of the investors involved, the notice more than adequately advised the Noteholders of the

nature of the action and the terms of the settlement. The court holds that adequate notice was given.

■ In *Blinder Robinson,* the court held that fairness should only be judged based on the fairness of the process. 511 F.Supp. at 801. That court expressly declined to consider the value of the offer. *Id.* In *Brucker v. Thyssen–Bornemisza Europe N.V.,* 424 F.Supp. 679 (S.D.N.Y.1976), *aff'd sub nom. by unpublished opinion, Brucker v. Indian Head, Inc.,* 559 F.2d 1202 (2d Cir.), *cert. denied,* 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 183 (1977), the court approved the settlement of a class action in which it considered the value of the settlement in relationship to the risks and likelihood of recovery if litigation was pursued instead of a settlement. *Id.* at 687. The court held in passing that this was a sufficient procedure under § 3(a)(10), *id.* at 690–91, but did not consider if the values of settlement and litigation would have been necessary to consider if they were not already necessary to consider in approving a class action settlement pursuant to Fed.R. Civ.P. 23(e). A leading commentator has disagreed with *Blinder Robinson* and argues the consideration of fairness involves a consideration of the value of the settlement compared to the possible results of litigation. *See Hicks,* § 3.02[4][b] & [c] at 3–40 to 3–46.1, 3–46.6 to 3.46.8. That reading seems more consistent with the plain language of the statute and its purposes. In any event, sufficient evidence has been presented to find both that the settlement is of fair value and was reached after fair dealing.

The litigation and possible liquidation of MSI which would result if the Restructuring were not consummated and the obligations of MSI under the Indenture were accelerated would involve substantial additional delay, expense, and uncertainty to the Noteholders and even further reduce the available recovery. The Proposed Settlement was negotiated between the Noteholders and MSI at arm's length. All beneficial holders of Mortgage Notes have consented to the Proposed Settlement after the opportunity to review the Restructuring Memorandum which contained detailed disclosures with respect to the Proposed Settlement and to MSI and there has been a full and fair opportunity for all Noteholders to participate directly in the Fairness Hearing. It is more probable than not that (i) the value of the New Securities to be received by the Noteholders pursuant to the Restructuring exceeds the recovery which the Noteholders could expect were MSI to be liquidated, (ii) the net recovery to the holders of the Restructure Notes in the event of liquidation of MSI immediately after completion of the Restructuring would likely be substantially the same as the net recovery to the holders of the Mortgage Notes in the event of liquidation of MSI immediately before completion of the Restructuring, and there is little likelihood of a material decline in such net recovery in the year following implementation of the Restructuring, (iii) there is no firm, feasible and currently available alternative solution to the defaults on the Mortgage Notes except for the Restructuring or the liquidation of MSI, (iv) after completion of the Restructuring, MSI may be able to continue in business as a going concern, and (v) if the Restructuring is not completed in the near future MSI will be forced into receivership and liquidation. Accordingly, the terms and conditions of the Proposed Settlement provide a fair value for the Noteholders.

As to the issue of fair dealing, at least five factors should be considered:

(1) the recommendation of counsel; (2) the scope of the discovery record as an indicator of the adequacy of the investigation into the facts; (3) the apparent alternatives to the settlement; (4) the nature and volume of responses from those receiving notice of the hearing; and (5) the opportunity for direct participation in the process of obtaining full disclosure.

*Blinder Robinson,* 511 F.Supp. at 801. *See also Hicks,* § 3.02[4][c].

MSI and CNA were represented by able counsel who recommended the Proposed Settlement after lengthy arm's length negotiations. The interests of other Noteholders were adequately represented by CNA and each Noteholder is a sophis-

ticated investor who consented to the Proposed Settlement after receiving adequate information to fairly assess the settlement. Prior to reaching the tentative settlement, the Noteholders had adequate access to the books, records, and facilities of MSI to make an informed decision about the settlement. They also had the advice of capable experts to aid them in their decision. Also the evidence before the court has been sufficient for the court, an observer, or a later reader of the record to make an informed decision. Alternatives to the Proposed Settlement were considered by the Noteholder Representatives. Acceleration and liquidation is a less desirable alternative to the Proposed Settlement and no satisfactory opportunities to sell the Mortgage Notes are available. None of the Noteholders, all of whom are sophisticated investors, appeared at the hearing to raise any objections to the Proposed Settlement. The Trustee provided additional evidence, but did not take any position on the fairness of the settlement. Adequate opportunity was provided for raising objections and the court would have accepted and considered informal objections. There was fair dealing in the process of settlement. *Cf. Blinder Robinson,* 511 F.Supp. at 801–02.

The court concludes that the applicable procedural and substantive fairness requirements of § 3(a)(10) of the 1933 Act have been satisfied.

IT IS THEREFORE ORDERED that:

(1) The compromise of the dispute between Continental Assurance Company and Macleod–Stedman, Inc. on substantially the terms and conditions as set forth in the Proposed Settlement, the Final Agreement of Settlement, and the Settlement Documents are approved as procedurally and substantively fair pursuant to and within the meaning of § 3(a)(10) of the Securities Act of 1933, 15 U.S.C. § 77c(a)(10).

(2) A status hearing is set for August 30, 1988 at 9:15 a.m.